**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Phillip CYPRIAN and Leroy V. Williams,**
**Defendants–Appellants.**

Nos. 91–2065, 91–2071 and 91–3190.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1994.

Decided May 6, 1994.

Robert J. Erickson, Joseph C. Wyderko (argued), Marilyn Gainey Mitchell, Dept. of Justice, Crim. Div., Washington, DC, Bernard A. Smith, Nancy Vecchiarelli, Office of U.S. Atty., Cleveland, OH, for U.S.

Suzanne Philbrick, Valparaiso, IN (argued), for Phillip Cyprian, defendant-appellant.

John L. Kelly, Jr., Kelly & Associates, Merrillville, IN (argued), for LeRoy V. Williams.

Before POSNER, Chief Judge, CUDAHY, Circuit Judge, and McDADE, District Judge.*

McDADE, District Judge.

This case involves three consolidated appeals by two criminal defendants who participated in the organization and operation of an illegal bingo game, the "McBride Game." Appellant Phillip Cyprian was indicted for violating various provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1962(c)) (Count 1) and is awaiting trial on this count. Cyprian was also indicted and convicted with Appellant

* Hon. Joe Billy McDade of the Central District of Illinois, sitting by designation.

Leroy Williams, among others, of conducting an illegal gambling business (18 U.S.C. § 1955) (Count 15); conspiring to defraud the Internal Revenue Service (18 U.S.C. § 371) (Count 16), making false entries in labor union records (29 U.S.C. § 439(c)) (Count 13);[1] embezzling labor union funds (29 U.S.C. § 501(c)) (Counts 3–9);[2] and filing false income tax returns (26 U.S.C. § 7206(1)) (Counts 19–21).

Cyprian has filed two appeals. In the first appeal, Cyprian claims that his final judgment of conviction on Counts 3–9, 13, 15, 16, and 19–21, entered on May 7, 1991, should be reversed on the grounds of misjoinder, failure to sever, selective prosecution, vindictive prosecution, outrageous government conduct, and ineffective assistance of counsel. The second appeal is interlocutory and challenges the district court's denial of Cyprian's post-trial motion to dismiss the severed RICO count (Count 1) on double jeopardy grounds. Williams appeals a final judgment of conviction on Counts 15 and 16, entered on May 7, 1991, on the grounds of insufficient evidence. For the reasons which follow, we affirm on all counts.

## BACKGROUND

In early 1983, Phillip Cyprian was president of the Local 1014 United Steel Workers Union and involved in various criminal activities. These activities included embezzlement of union funds, tax fraud, and making illegal entries in labor union records. In addition to these activities, Cyprian and his administrative aide, Leroy Williams, helped others organize and operate an illegal gambling business in violation of RICO, namely, an illegal bingo game known as the "McBride Game."

The "McBride Game" was allegedly organized as a non-profit venture under the sponsorship of St. Mark's Catholic Church in Gary, Indiana, where Monsignor Morales, one of the game's instigators, was the parish priest. However, the profits from the McBride Game, rather than being donated to the church, were pocketed by the principal operators of the game: Seymour Levin, Seymour Klein, Louis Del Grosso, and Kathleen Rainey. Bingo, apparently a favorite past time in middle America, is illegal in Indiana if the revenue generated from the game is pocketed as profit for the game's sponsors, rather than donated to charitable organizations.[3] Profit is exactly what Phillip Cyprian, Leroy Williams, and the principal operators generated when the "McBride Game" gained momentum. By March 1986, as many as 35 chartered buses from nearby states brought people to the McBride Game, with attendance ranging from 450 to 700 people on "regular" nights when the prize was $500 per game, and 700 to 1200 people on "bonanza" nights when the prize was $1,000 per game.[4] On an average bonanza night, the McBride Game would have gross receipts of about $90,500, with a net profit of $37,500. Portions of the generated profit were paid out each week as salary to the "frontmen" organizers, Monsignor Morales and Phillip Cyprian, and to McBride Game "employees."[5] Leroy Williams initially assumed the role of a security guard supervisor[6] and

---

1. Both appellants Cyprian and Williams were charged with a second count of making false entries in union records (Count 12), but the district court granted a judgment of acquittal on that count at the close of the government's case.

2. Appellant Cyprian was also charged with another count of embezzling labor union funds (Count 10), but the district court dismissed that count before trial.

3. *See infra* note 15.

4. On "regular" nights, the price of admission was $30 and on "bonanza" nights, it was $50.

5. Between early 1983 and March 15, 1986 (the day the government shut the game down), the principal operators of the McBride Game paid

Cyprian between $500 and $1,000 per week in cash, in addition to the monthly rent for McBride Hall—approximately $6,000 per month. Leroy Williams received $10 an hour as a security guard. Although not directly relevant to this appeal, Monsignor Morales received $1,000 per week in cash until the spring of 1984, when his weekly payment was increased to $2,000.

6. Both parties indicate that Williams' responsibilities, even prior to the 1985 contract naming him as the director of security, included hiring, supervising, and paying the 9–10 armed security guards each night. Generally, each night after the bingo games were over, Williams would give Klein a piece of paper with the total amount needed for payroll; Klein or Del Grosso would then give Williams the money and destroy the

would periodically take reservations for the games during the week.

The McBride Game operated successfully on this basis from early 1983 until Cyprian lost the election for president of Local 1014 to Larry Regan. Before Regan took office on May 31, 1985, the McBride Game operators, in an apparent attempt to prevent Regan from terminating the McBride Game, created, and had the Church and Union respectively execute, two backdated contracts naming Williams as the official director of security for the McBride Game and Local 1014's property manager for McBride Hall. Although Regan's independent attempts to shut the game down were unsuccessful, on March 18, 1986, the government shut the game down based in part on information obtained by Regan.

### APPELLANT CYPRIAN'S CLAIMS

This case involves two appeals by Appellant Phillip Cyprian ["Cyprian"]. The first appeal seeks reversal of his convictions on Counts 3–9, 13, 15, 16, and 19–21 on six grounds: misjoinder; severance; selective prosecution; vindictive prosecution; outrageous government conduct; and ineffective assistance of counsel.[7] The second appeal is interlocutory and raises only one issue: did the trial court commit reversible error when it denied Cyprian's motion to dismiss Count 1? Cyprian contends that it did and asks this court to dismiss Count 1 on double jeopardy grounds.

#### A. *Reversal of Convictions*

##### 1. *Misjoinder and Severance*

When two or more defendants are charged in a single indictment, Rule 8(b) governs joinder of defendants and offenses. *United*

States v. *Brisco*, 896 F.2d 1476, 1515 (7th Cir.), *cert. denied*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). Rule 8(b) provides:

**Rule 8. Joinder of Offenses and of Defendants.**

**(a) Joinder of Offenses.** * * * *

**(b) Joinder of Defendants.** Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.[8] Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Under Rule 8(b), multiple defendants may be tried together if their charged conduct arose from the "same act or transaction or the same series of acts or transactions." In other words, if the acts of each defendant are performed according to a common scheme or plan, joinder is proper. The issue of joinder is a threshold question, determined by whether the allegations in the indictment, as returned, satisfy the requirements of Rule 8(b). *United States v. Curry*, 977 F.2d 1042, 1049 (7th Cir.1992).

In the original indictment, the government charged Cyprian with violations of RICO, embezzlement, tax fraud, operating an illegal gambling business, and making false entries in union records. As returned, all counts in the indictment were properly joined by allegations that Cyprian had conducted the affairs of Local 1014 through a pattern of racketeering activity; these allegations served not only as the predicate acts for the RICO charge in Count 1, but also as

---

piece of paper. Williams then paid each guard approximately $7–10 an hour.

7. This claim addresses claims related to Cyprian's sentencing hearing but does not deserve discussion because it has no possible merit. However, we note that, although a defendant may raise a claim of ineffective assistance of counsel for the first time on direct appeal, *Guinan v. United States*, 6 F.3d 468 (7th Cir.1993), the Court cannot review Cyprian's claim because it is based on facts which are not contained in the trial record. *United States v. Taglia*, 922

F.2d 413, 417 (7th Cir.1991) (ineffective assistance of counsel claim can be raised on direct appeal but is "necessarily limited to the trial record, since a court of appeals does not take evidence.").

8. Acts or transactions are usually considered part of the "same series" if they are performed pursuant to a common scheme or plan, such as a conspiracy. *United States v. Curry*, 977 F.2d 1042, 1049 (7th Cir.1992).

the substantive charges in Counts 3–9, 13, 15, 16, and 19–21.

[4] Before trial on the original indictment, Cyprian filed a Rule 14 motion for severance from his codefendants on all counts. Federal Rule of Criminal Procedure 14 provides in relevant part:

**Rule 14. Relief from Prejudicial Joinder.**

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

The trial judge denied the motion but decided to sever the RICO count from the remaining charges in the indictment. Cyprian was then tried by a jury on Counts 3–9, 13, 15, 16, and Counts 19–21. The record indicates that Cyprian's trial counsel did not renew his motion for severance in the district court before, during, or after trial. However, after the jury convicted Cyprian on the unsevered counts, Cyprian filed both a motion to dismiss Count 1 on double jeopardy grounds—an issue discussed below—and this appeal, arguing that the embezzlement and false entry charges were misjoined with the tax fraud and illegal gambling charges, because the predicate acts for embezzlement and false entry did not relate to the acts connected with tax fraud and illegal gambling.

Given this sequence of events, it appears that Cyprian made a tactical decision not to renew the motion for severance, but instead to gamble on a joint trial and take his chances at acquittal, perhaps knowing that, if convicted, he could later argue that Count 1 was barred by the Double Jeopardy Clause, an argument which had some support at that time. *See Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (Double Jeopardy Clause bars reprosecution of "same conduct"). Thus, having placed his bets on

acquittal in a joint trial or dismissal of Count 1, Cyprian cannot now hedge that bet by renewing his motion for severance "so that he can have another crack at a jury." *See United States v. Taglia*, 922 F.2d 413, 417 (7th Cir.1991). Nor can Cyprian now claim that he is entitled to a new trial because Counts 3–9, 13, 15, 16 and 19–21 were misjoined.

■ First, when the indictment was returned, joinder was proper under Rule 8, even if severance of Count 1 later raised the issue of whether the remaining counts should have been severed under Rule 14. Second, "[o]nce the Rule 8 requirements [are] met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14...." *E.g., United States v. Lane*, 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986). *See also United States v. Balzano*, 916 F.2d 1273, 1279 (7th Cir.1990). A trial judge's decision regarding severance will be reversed only for an abuse of discretion. *United States v. Moya–Gomez*, 860 F.2d 706, 754 (7th Cir. 1988); *Balzano*, 916 F.2d at 1281. Because the trial record does not indicate that Cyprian renewed his severance motion after the trial judge severed the RICO count, he has waived that claim.[9] *See United States v. Taglia*, 922 F.2d 413, 416 (7th Cir.1991).

■ However, even if there had been no waiver, Cyprian would need to establish actual prejudice from the denial of his motion for severance, "not merely that a separate trial would offer him a better chance of acquittal." *E.g., United States v. Balzano*, 916 F.2d 1273, 1280 (7th Cir.1990). Actual prejudice did not result from the district court's denial of Cyprian's motion for severance. At oral argument, counsel argued that Cyprian was denied a fair trial because he was forced to stand trial with codefendants whose defenses were antagonistic to his own. This argument is meritless. In *Zafiro v. United States*, —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993), *aff'd*, 945 F.2d 881 (7th Cir.1991), the Supreme Court found that "[m]utually antagonistic defenses are not

---

9. Although Cyprian raised ineffective assistance of trial counsel claims in his *pro se* brief, he does not contend on direct appeal that trial counsel

was ineffective for his failure to renew the severance motion.

prejudicial *per se.*" *Id.* at ——, 113 S.Ct. at 938. Cyprian argues only that, although he wanted to call a witness who would have testified that one of the backdated contracts was not signed by Cyprian at the time it was notarized, he was prevented from doing so because this testimony would have been prejudicial to the defense of his codefendant, Monsignor Morales. Although Cyprian is convinced that this evidence was crucial to his defense, we, and apparently the trial judge as well, are not similarly persuaded. It is generally desirable to try all defendants together and let the jury decide guilt and innocence from the evidence. So long as the jury is properly instructed to keep the evidence separate as to each defendant, severance is not warranted. *Balzano,* 916 F.2d at 1282. In this case, the government alleges (and Cyprian does not dispute) that the jury was given this admonitory instruction. Thus, even if Cyprian had not waived his motion for severance at trial, we would not reverse the trial judge's decision denying the motion based on such scant allegations.

2. *Selective Prosecution, Vindictive Prosecution, and Outrageous Government Conduct*

■ Appellant Cyprian also claims that he was entitled to an evidentiary hearing in the district court on the issues of selective prosecution, vindictive prosecution, and outrageous government conduct. The government argues that Cyprian has waived these claims because he did not raise them in a pretrial motion under F.R.Crim.P. 12(b)(1). We believe that these issues have been preserved for appeal because the district court effectively "waived" Cyprian's "waiver" when it considered and made findings on these issues after trial. Nonetheless, the Court finds Cyprian's claims meritless because he has failed to establish "a *prima facie* case based

on facts sufficient to raise a reasonable doubt about the prosecutor's purpose." *Jarrett v. United States,* 822 F.2d 1438, 1443 (7th Cir. 1987).

(a) *Selective Prosecution*

■ To make out a *prima facie* case of selective prosecution, defendants must show that: (1) they were singled out for prosecution while other violators similarly situated were not prosecuted; and (2) the decision to prosecute was based on an arbitrary classification such as race, religion, or the exercise of constitutional rights. *Jarrett,* 822 F.2d at 1443. To obtain an evidentiary hearing, the factual basis for these claims must be more than colorable. In other words, a defendant must proffer "sufficient evidence to raise a reasonable doubt that the government acted properly in seeking the indictment." *United States v. Benson,* 941 F.2d 598, 611 (7th Cir.1991).

■ Cyprian argues that the operators and organizers of the McBride Game were singled out for prosecution because the Game was allegedly sponsored by St. Mark's Catholic Church and organized (in part) by Monsignor Morales, a Catholic Priest. In fact, during argument before this court, Cyprian actually admitted that he believes an "anti-Catholic plot in the United States Attorney's Office in the Northern District of Indiana" motivated the decision to prosecute those operating the McBride Game.

This argument is absurd. Cyprian's only evidence of an alleged vendetta against Catholics [10] is the testimony of Carol Jones. Jones testified at trial that in 1986 she attended other bingo games in northwest Indiana involving substantial amounts of money which were run by charitable organizations with religious affiliations.[11] Although

---

10. Selective prosecution is grounds for acquittal only if the basis of selection is a forbidden ground, such as race, religion or political opinion. "Vindictive" motives may play a part in this decision, blurring the line between a selective and vindictive prosecution claim, however, vindictive motives are not necessarily synonymous with class-based prejudice or hostility and are not a required element of a selective prosecution claim. In this case, Cyprian's claim of a "vendetta" against Catholics seems to be concerned

with an allegedly deliberate act of prejudice based upon the Game's *apparent* affiliation with the Catholic Church. This religious bias is distinct from the retaliatory motive alleged by Cyprian in his vindictive prosecution claim.

11. Apparently, bingo games also were held at the American Legion, VFW, Carpenter's Hall, Sis Batist, St. George Serbian and St. Mark Michaels.

this testimony might be probative on the issue of whether other bingo games were similarly situated to the McBride Game, it is not probative enough. Cyprian has offered no evidence as to whether these other games were illegal or bogus charitable operations, nor has he established that these games were as large as the McBride Game, i.e., that 35 chartered buses from nearby states regularly attended these games. Furthermore, Jones' testimony does not establish the religious affiliation of the other local bingo games and thus does not address the issue of whether the McBride Game was the only Catholic game "in town." This evidence, Cyprian's only evidence, does not even begin to satisfy the second prong of the *prima facie* case. Finally, even though the government appears to concede that other bingo games in the area were not prosecuted, the McBride Game was not only illegal, and subject to prosecution on that ground alone, but was also apparently the largest bingo game of its kind. Certainly the government may concentrate its efforts on those violations which "appear most flagrant." *United States v. Heilman*, 614 F.2d 1133, 1139 (7th Cir.), *cert. denied*, 447 U.S. 922, 100 S.Ct. 3014, 65 L.Ed.2d 1114 (1980). Thus, it is eminently clear that Cyprian cannot establish a *prima facie* case of selective prosecution.

(b) *Vindictive Prosecution*

 It is equally clear that the claims of vindictive prosecution must fail. A prosecution is vindictive, in violation of the Fifth Amendment Due Process Clause, if it is undertaken in retaliation for the exercise of a legally protected statutory or constitutional right. *United States v. Dickerson*, 975 F.2d 1245, 1250–51 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1316, 122 L.Ed.2d 703 (1993). *See also United States v. Benson*, 941 F.2d 598, 611 (7th Cir.1991) ("The Fifth Amendment has been interpreted to prohibit the government from prosecuting a defendant because of some specific animus or ill will on the prosecutor's part, or to punish the defendant for exercising a legally protected statutory or constitutional right."). An evidentiary hearing is not required unless a defendant has established that: (1) the prosecutor harbored genuine animus; and (2)

absent this motive, defendant would not have been prosecuted. *Dickerson*, 975 F.2d at 1250. In all, there must be sufficient evidence produced to raise a reasonable doubt that the government acted properly in seeking the indictment. *Benson*, 941 F.2d at 611.

 Cyprian alleges that he was vindictively prosecuted for his involvement in the McBride Game in "retaliation" for the alleged embarrassment he caused the United States Attorney's Office when he was acquitted on certain charges brought against him on unrelated matters in 1985. The government argues that the fact it prosecuted Cyprian on unrelated charges before it brought an indictment in this case does not establish actual vindictiveness. The investigation of Cyprian's involvement in the McBride Game began in June 1985, five months before the unrelated prosecution which Cyprian believes caused the government to retaliate against him in this case. Because the McBride Game investigation began before it lost its case against Cyprian in 1985, the indictment in this case was not brought in retaliation for any alleged "embarrassment" in the 1985 case. Regardless, even if Cyprian's allegation was supported by evidence that the prosecutor harbored genuine animus, Cyprian's claim still does not establish a *prima facie* case. The facts indicate that the prosecution of this case was initiated based on information gained through an investigation which began before the prosecutor could have formed the alleged animus resulting from the outcome of its failed 1985 prosecution.

(c) *Outrageous Government Conduct*

 Consequently, Cyprian also cannot claim relief based on the doctrine of outrageous government conduct. To claim relief under this doctrine, the government's conduct must violate the Fifth Amendment Due Process Clause, and the Due Process Clause is violated only when the government violates a defendant's protected rights. *United States v. Olson*, 978 F.2d 1472, 1481–82 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1614, 123 L.Ed.2d 174, 175 (1993). *See also United States v. Miller*, 891 F.2d 1265,

1267 (7th Cir.1989) (outrageous government conduct is that which is fundamentally unfair and shocking to the universal sense of justice).

■ Cyprian contends that the government's prosecutorial conduct was outrageous because: (1) the government used information supplied by Larry Regan, Cyprian's political opponent in the Local 1014 election for president, to indict Cyprian; and (2) government agents supplied Regan with the body recorder that Regan used to record several conversations with Monsignor Morales about the McBride Game. In response to these arguments, the government contends that it is not only entitled to use information provided by informants in the course of an investigation, but it is also entitled to use body recorders to obtain information. *United States v. Sababu*, 891 F.2d 1308, 1328 (7th Cir.1989). Furthermore, the government argues that since the recorded conversation did not involve Cyprian, Cyprian has no standing to raise this argument.

This Circuit has never reversed a conviction based on the doctrine of outrageous government conduct, and Cyprian's conviction will not be the first. *See United States v. Olson*, 978 F.2d 1472, 1481 (7th Cir.1992) (validity of doctrine is an open question in this circuit and one member of this court, Judge Easterbrook, has called for its outright rejection). Although Cyprian has the right to challenge government conduct causally related to his conviction, and thus has standing to raise an outrageous government conduct claim, the use of informants wearing a wire is not outrageous conduct. The government routinely (and constitutionally) uses informants and body recorders to obtain information. *Sababu*, 891 F.2d at 1328.

## B. *Interlocutory Appeal*

■ Before trial on the original indictment, the trial judge denied Cyprian's Rule 14 motion for severance from his codefendants but severed Count 1, the RICO charge, from Counts 2–25. After the trial, Cyprian filed a motion to dismiss Count 1, which was denied. Relying on *Grady v. Corbin*, 495

U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which held that the "same conduct" cannot be prosecuted twice, Cyprian contended in the district court that a trial on the severed RICO count was barred by the Double Jeopardy Clause,[12] because he had been convicted of the predicate racketeering acts in the substantive charges alleged in Counts 3–9, 13, 15, 16, and 19–21. On appeal, although Cyprian acknowledges that *Grady* has been expressly overruled in *United States v. Dixon*, —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), he now seeks to distinguish the factual basis for his claim from the claim made in *Grady*.

In *Grady*, the defendant killed another driver while driving intoxicated. The City of LaGrange issued two traffic tickets for driving while intoxicated, to which the defendant soon thereafter pled guilty. Sometime after the defendant entered his guilty plea in the county court, a grand jury in the State of New York returned an indictment charging him with reckless manslaughter, second degree vehicular manslaughter, and criminally negligent homicide. The prosecution filed a bill of particulars which identified the three reckless or negligent acts it intended to rely upon in proving the homicide and assault charges. These "predicate" acts were the same acts charged in the traffic tickets to which defendant had previously pled guilty. The New York appellate court held that defendant's prosecution was barred by the Double Jeopardy Clause because defendant had previously pled guilty to the "same conduct" that the State sought to prosecute. In the United States Supreme Court, defendant sought to bar the subsequent homicide prosecution on double jeopardy grounds, arguing that the bill of particulars expressed an intention to "rely on the prior traffic offenses as the acts necessary to prove the homicide and assault charges." *Grady v. Corbin*, 495 U.S. 508, 511–513, 110 S.Ct. 2084, 2087–2089, 109 L.Ed.2d 548 (1990). Relying on its dicta in *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980), the Supreme Court in *Grady* held that "the Double Jeopardy Clause bars a subsequent prosecution if,

---

12. The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which defendant has already been prosecuted." *Id.* 495 U.S. at 510, 110 S.Ct. at 2087.

■ On appeal, Cyprian argues that unlike the facts in *Grady* and its progeny, in this case the predicate acts charged in the RICO count were originally charged in the same indictment with the substantive charges for which Cyprian was convicted. Cyprian's claim is meritless for two reasons. First, Cyprian waived the right to challenge Count 1 on double jeopardy grounds because his trial counsel did not object when the trial judge severed Count 1 from the remaining counts. *See United States v. Chapman,* 954 F.2d 1352, 1360–1361 (7th Cir.1992). Second, even if the claim had not been waived, Cyprian's argument is the classic distinction without a difference because it boils down to a *Grady* claim of double jeopardy based on prosecution of the same conduct. The Supreme Court expressly overruled Grady's "same conduct" test in *United States v. Dixon,* ——— U.S. ———, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).

In *Dixon,* defendants had been arrested, released on bail, and subsequently prosecuted for criminal contempt of court when they engaged in conduct which violated the terms of bail set by court order. The conduct for which defendants were prosecuted under the contempt statute was later the subject of criminal prosecution on unrelated charges. The issue in *Dixon* was whether the Double Jeopardy Clause barred prosecution of a defendant on substantive criminal charges based upon the same conduct for which he previously had been held in criminal contempt of court. The Supreme Court held that the "same conduct" test established in

*Grady* lacked constitutional foundation because the Double Jeopardy Clause only bars reprosecution of crimes which require proof of the same elements. *Id.* at ———, 113 S.Ct. at 2860. Accordingly, in *Dixon,* although the conduct of the accused was the same in both prosecutions, the two offenses charged each had an element not embraced in the other, leaving the subsequent prosecution free from double jeopardy under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (double jeopardy bars subsequent punishment or prosecution of offense which contains "same elements" of offense already prosecuted).

This case is similar to *Dixon:* the conduct alleged as predicate acts in Count 1 is the same as those alleged as substantive offenses in Counts 3–9, 13, 15, 16, and 19–21. In this Circuit, the Double Jeopardy Clause does not bar prosecution of a RICO charge based on predicate acts which comprise the "same conduct" previously prosecuted as a substantive offense. This rule satisfies the *Blockburger* test by recognizing that "in order to prevail on a RICO charge, the government must prove a sort of antisocial conduct entirely different, in both type and magnitude, from the underlying offenses.... and at times [make] a painstaking review not of a single criminal act, but of a complex series of transactions often spanning many years and many states." *United States v. O'Connor,* 953 F.2d 338, 342, 344 (7th Cir.), *cert. denied,* —— U.S. ———, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992).[13] Thus, we will affirm the district court's denial of Cyprian's motion to dismiss Count 1.

## APPELLANT WILLIAMS' CLAIMS

Appellant Leroy Williams ["Williams"] contends that the evidence at trial was insuf-

---

13. In *O'Connor,* the defendant was convicted of racketeering in violation of RICO. Among the predicate acts alleged in support of the RICO charge were crimes for which the defendant had already been prosecuted. Defendant moved to strike these predicate acts based on the Double Jeopardy Clause. The district court denied the motion. On appeal, defendant argued that the Supreme Court's decision in *Grady* mandated reversal of his RICO conviction because it effectively overruled a prior case, *Garrett v. United*

States, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), which had held that prosecution for a continuing criminal enterprise (CCE) offense (such as RICO) after an earlier prosecution for one of the predicate acts is constitutional under the Double Jeopardy Clause of the Fifth Amendment. We held that double jeopardy did not bar the subsequent prosecution, because "a RICO offense is not ... in any sense the 'same' offense as the predicate offenses." *O'Connor,* 953 F.2d at 344.

ficient to sustain his convictions on Count 15 for conducting an illegal gambling business and on Count 16 for conspiring to defraud the Internal Revenue Service. Williams bears a heavy burden in trying to reverse his conviction for insufficient evidence. The standard of review is well-established. If the reviewing court, considering all the evidence in the light most favorable to the prosecution, finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," it must affirm the conviction. *United States v. Marren*, 890 F.2d 924, 933 (7th Cir.1989). We may overturn a jury verdict only "when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985) (citations omitted).

## A. *Count 15*

 Williams concedes that the evidence was sufficient to establish each element of the illegal gambling business charge under 18 U.S.C. § 1955,[14] i.e., that he was one of the five persons who "conducted" the McBride bingo games within the meaning of

§ 1955.[15] However, Williams contends that his conviction should be reversed pursuant to § 1955(e),[16] because "the evidence did not show that he *knew* the McBride bingo games" were illegal, i.e., "operated as a profit-making gambling business rather than as tax exempt fundraisers for St. Mark's and Nativity of Our Savior parishes." This state of mind theory is not supported by the express language of the statute or any case law and is not an essential element of the offense which the government must prove for a conviction. In fact, because guilt under § 1955 is premised upon "conduct," Williams did not need to know that his actions were illegal; he only needed to know that he performed the acts which turned out to be illegal. Nonetheless, on the basis that knowledge of illegality is an element of the offense, Williams challenges the sufficiency of the government's evidence.

Williams first argues that § 1955(e) excludes from § 1955's prohibitions bingo activities of non-profit organizations which qualify for a § 501(c) tax exemption, in this case the Catholic Church, and that he was simply an employee providing security services for the bingo games.[17] Second, Williams contends

14. To establish a violation of § 1955, the government was required to prove that Williams conducted, financed, managed, supervised, directed, or owned a gambling business that: (1) violated state law; (2) involved five or more persons; and (3) was either in substantial continuous operation for more than 30 days or had gross revenue of $2,000 or more in a single day. *United States v. Balistrieri*, 779 F.2d 1191, 1210 (7th Cir.1985), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986).

15. The word "conduct" is broad in scope, and "means to perform any act, function or duty which is necessary to or helpful in the ordinary operation of the business, and ... a person may be found to conduct a gambling business even though he is a mere servant or employee having no part in the management or control of the business and no share in the profits, but ... a mere bettor or customer of a gambling business cannot be said to conduct the business." *United States v. Greco*, 619 F.2d 635, 638 (7th Cir.1980); *Sanabria v. United States*, 437 U.S. 54, 70 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43 (1978) ("18 U.S.C. § 1955 proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor."). Williams concedes that security guards are included in the "conducting" definition of § 1955, because they

confer a benefit on the operation by protecting the illegal gambling.

16. 18 U.S.C. § 1955(e) (1993) provides:
**§ 1955. Prohibition of illegal gambling businesses**
(e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the course of such activity.

17. The government argues that this exemption applies only if the gross proceeds were paid out to the employees to reimburse them for actual expenses incurred from operation of the game, not as salary. According to this theory, any payments made by the Church to Williams for his services as a security guard would not be out-of-pocket expenses and therefore outside the purview of § 1955(e). The government thus argues that this section contemplates a virtual 100% voluntary operation by a charitable organization.

The Court finds the government's extreme construction somewhat improbable. A more·reason-

that he merely negotiated two contracts for Local 1014 with St. Mark's Parish to operate bingo games in McBride Hall and to hire security guards for the games. As part of the agreement, these guards would be paid by the tenant of McBride Hall, St. Mark's Parish. Third, Williams alleges that his participation in the enterprise stopped short of involvement in the illegal inner workings of the game because he merely acted as the director of security for an organization exempted from § 1955, i.e., the Catholic Church. Accordingly, Williams urges the Court to reverse his conviction on Count 15 under § 1955 on the theory that he dealt at arms-length with the principal operators of the McBride Game and thus did not know that the proceeds of the game were pocketed as profit rather than donated to the Catholic Church.

The court will decline Williams' invitation. There is sufficient circumstantial evidence in the record from which the jury could have reasonably concluded that Williams knew, in reality, that the Church was not the actual operator of the McBride Game. First, although Williams' construction of the evidence has superficial appeal, it ignores the fact that Williams stepped out of his role as a mere employee when he assumed positions as the director of security and the property manager of McBride Hall under the authority of two contracts which he knew were backdated. Williams argues that the issue of whether he knew these contracts were backdated goes to the falsification of union records charge which is not relevant to the issue of whether he knew that the McBride Game was a tax-exempt activity. We disagree. The sole purpose of the backdated contracts making Williams the property manager was to allow the bingo games to continue after Cyprian was replaced on the Building Corporation's Board of Directors by Regan. Obviously, Williams was trusted to carry out this design as the newly created building manager. Mere employees do not participate in the formation of positions which they subsequently fill—especially when these positions

are "backdated." Furthermore, there is evidence that the agreement naming Williams as the director of security was passed from Cyprian to Rainey and then to Monsignor Morales, who subsequently met Williams at a gas station, where he gave the signed agreement back to Williams. This evidence does not lend itself to certainty, but we find it odd that a bingo game employee would be promoted at a gas station by a priest. A more convincing construction of the evidence (which apparently persuaded the jury) is that Williams knew the McBride Game was an illegal gambling business and was involved in the internal operations of the organization.

Second, Williams seemingly participated in management activities. When Regan asked Monsignor Morales for copies of the bills paid in connection with the McBride Game, it was Williams, not Morales, who provided a folder with copies of the bills to Kathleen Rainey, who gave them to Regan. Apparently, Williams had access to copies of the bills for the McBride Game which had been paid in cash, indicating that he did not simply receive payment for himself and others for security guard services, but actually participated in the management of the McBride Game proceeds. Further, Rainey, although closely connected with the other principal operators, actually took orders from these operators, whom she characterized as "the management." Thus, for Williams to provide Rainey with information appears to closely tie Williams to the principal operators in a way which exceeds the role of a uniformed employee/security guard.

Third, Williams' participation in the operation of the game "behind the scenes" gave him access to information which could lead a reasonable jury to conclude that Williams knew that he did not work for the Church. For instance, Williams' role in the Game's operations evolved from a security guard supervisor who paid his guards in cash and occasionally took reservations for the games during the week to a figurehead property manager negotiating backdated contracts

able construction would allow a church volunteer/employee to hire an outside provider to render services like those provided by the security guards in this case. As discussed *infra*, there is

evidence in the record from which the jury could find that Williams was neither an employee nor an independent contractor for the church.

with Monsignor Morales. The evidence further indicates that the principal operators instructed the employees, including Williams, to tell anyone who asked that they were unpaid church volunteers working for Morales. Williams clearly knew that this story was false since he and the other guards were paid in cash each night, not by Morales, but by Klein and Del Grosso, two of the principal operators of the games. Williams also knew that neither he nor the other security guards were issued W–2 or 1099 tax forms. Although the evidence is vague as to who was responsible for issuing W–2 and 1099 tax forms to the security guards, Williams admitted to IRS agents that he hired security guards to work "for him," leading us to conclude that he may in fact have been responsible for issuing W–2 forms and filing 1099s for "his" employees. In fact, IRS agent Seamon concluded from Williams' tax return that his income as a security guard was derived from self-employment, not employment for someone else. Regardless, the evidence does indicate that Williams knew he and others were not *unpaid* church volunteers. All told, a reasonable jury could find from the evidence, including all reasonable inferences to be drawn therefrom, that Williams was liable for conducting the McBride Game under § 1955.

## B. *Count 16*

▓▓▓ Williams also contends that the evidence was insufficient to sustain his conviction on Count 16 for conspiring to defraud the United States by impeding, impairing, obstructing, and defeating the functions of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of income taxes in violation of 18 U.S.C. § 371.[18] Much like his argument regarding § 1955, Williams argues that his subjective knowledge of the McBride Game's illegality is essential to his guilt. In particular, Williams argues that his conviction should be reversed because the evidence did not show that he willfully violated any federal tax laws. *United States v. Bishop*, 412 U.S.

346, 359, 93 S.Ct. 2008, 2016, 36 L.Ed.2d 941 (1973) (to uphold a felony conviction for violation of a tax law, the government must demonstrate purposeful violation of the statute).

*Bishop* is distinguishable from this case. In *Bishop*, the tax statutes under review expressly included "willfulness" as an element for liability. In this case, § 371 does not contain a state of mind requirement. Furthermore, this Circuit's interpretation of § 371 liability has never indicated that subjective intent to commit a crime is a required element under this provision. *See United States v. Hooks*, 848 F.2d 785, 792 (7th Cir. 1988).

In *Hooks*, the defendant was charged with the crime of conspiring to defraud the United States, and we held that the government had the burden of proving three elements under § 371: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States. *Id.* at 792. Relying on *Ingram v. United States*, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959), we found in *Hooks* that the relevant intent under § 371 required the government to prove, not "that the conspirator was aware of the criminality of the objective," but that the conspirator "knew of the liability for federal taxes." *Hooks*, 848 F.2d at 792. *See also United States v. Marren*, 890 F.2d 924, 932–33 (7th Cir.1989) (court held that the knowledge required under § 371 for a charge of RICO conspiracy to avoid income tax liability amounts only to knowledge that one sought to avoid liability for federal taxes, not knowledge of the criminality of their objectives). Thus, to convict Williams under the conspiracy to defraud clause of § 371, the government did not need to charge or prove that Williams agreed (or had the intent) to commit a substantive tax offense. Rather, the government was required to prove only that Williams "agreed to interfere with or ob-

---

18. 18 U.S.C. § 371 provides in relevant part:
 **§ 371. Conspiracy to commit offense or to defraud United States**
 If two or more persons conspire either to commit any offense against the United States, or to mit any offense against the United States, or to

defraud the United States, ... and one or more of such persons to any act of to effect the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

struct" the United States' ability to collect taxes by defrauding the IRS. *United States v. Bucey,* 876 F.2d 1297, 1312 (7th Cir.1989).

Williams argues that he was not involved in the scheme but believed that the McBride Game did not have any tax obligations because it was tax exempt. He also argues that the fact he was paid in cash and paid the security guards in cash does not suggest that he was a part of the § 371 conspiracy, because the government never proved that Williams was responsible for giving the guards W–2 forms, or filing 1099s for the guards. Third, Williams believes that it was the responsibility of St. Mark's to file the 1099s for its employees. Williams concedes, however, that he would be guilty of the § 371 conspiracy if it had been his responsibility to file the 1099s and he then paid his guards in cash.

The government contends that Williams' "agreement" with the principal operators of the McBride Game to defraud the United States under § 371 is manifested by Williams' involvement in the overall scheme to operate the McBride Game as a profit-making venture, even though the Game was ostensibly held out as a tax-exempt organization. The facts indicate that Williams was not only paid in cash and paid others in cash, but also hired the security guards. Although Williams did not provide W–2 forms or file 1099s for the guards, on this latter point, there is evidence in the record to support the view that Williams was responsible for filing 1099s for and providing W–2 forms to them. For instance, IRS agent Seamon testified that Williams was not exactly an "employee" or "hireling" of the Game. Rather, Williams' individual tax return reported income from security guard services as if he were "self-employed." If Williams really believed that he was an employee of the Church, then it is odd that he filed an independent tax return as if he were self-employed. Further, IRS agent Seamon testified that Williams paid "his people" each night from money given to him by Klein. If Williams was an "independent contractor" providing security services for the McBride Game, then he was responsible for providing W–2 and 1099 forms to the guards. This responsibility, coupled with

Williams act of paying the guards in cash, would give the jury a reasonable basis for finding Williams guilty of a § 371 conspiracy.

This conclusion is supported by Monsignor Morales' testimony that he neither knew Williams nor knew anything about his employment with the Game, indicating at least that Williams was not an employee of the Church. Although Morales' testimony is contradicted by evidence that Morales met Williams at a gas station to hand over the signed, backdated contracts, we find Morales' testimony consistent with the theory that Morales merely served as a "frontman" for the McBride Game, rather than as Williams' employer. Certainly the backdated contracts, to which Williams was a party, were created to obfuscate the relationship between the Church and the organization and operation of the McBride Game.

Although not definitive, we believe that Williams' duplicity regarding his true role in the McBride Game provides sufficient circumstantial evidence for a reasonable jury to find that Williams conducted an illegal gambling business with others for profit and conspired with those persons to hide the Game's profits behind the facade of a tax-exempt organization, i.e., the Catholic Church. The evidence is clearly not as strong on Count 16 as it is on Count 15, but Williams' dubious roles in the McBride Game could lead a reasonable jury to conclude that he was part of the overall conspiracy to hide the McBride Game profits from the IRS under the guise of St. Mark's tax-exempt status in violation of § 371. Therefore, the conviction on Count 16 is also affirmed.

## CONCLUSION

For the foregoing reasons, Appellant Cyprian's convictions on Counts 3–9, Counts 13, 15, and 16, and Counts 19–21 are AFFIRMED, and the trial court's denial of Appellant Cyprian's Motion to Dismiss Count 1 is AFFIRMED. Appellant Williams' convictions on Counts 15 and 16 are also AFFIRMED.