THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FAYGIE FIELDS, Defendant-Appellant.

Fifth District   No. 5—00—0243

Opinion filed June 15, 2001.

Locke E. Bowman, of University of Chicago Law School, of Chicago, for appellant.

Jeffrey Farris, State's Attorney, of Cairo (Norbert J. Goetten, Stephen E. Norris, and Patrick D. Daly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE CHAPMAN delivered the opinion of the court:

On January 12, 2000, the defendant, Faygie Fields, was tried before a jury and convicted of two counts of aggravated battery to corrections officers at Tamms Correctional Center (Tamms), where Fields was incarcerated. Fields was sentenced to four years' imprisonment to run consecutively with a previously imposed sentence. Fields contends on appeal that (1) the trial court erred in denying without an evidentiary hearing his motion to dismiss the charges as selective, vindictive, and retaliatory, (2) he was denied a fair trial because of the types of security measures taken in the courtroom, and (3) the prosecutor's comments during closing argument were prejudicial. We affirm.

## Background

On October 19, 1998, Fields twice committed aggravated battery

to a corrections officer when he reached through the chuckhole in his cell door and grabbed the keys of an officer and then struck the metal cover of his chuckhole when a different officer was attempting to lock it down. Neither officer sustained serious injury. Immediately following this incident, disciplinary reports were provided to the assistant warden, and Fields was recommended for a year of segregation time, one year's demotion, and the loss of good-conduct credit.

Almost three months later, on January 7, 1999, Fields and three other inmates filed a class action lawsuit against various Department of Corrections (DOC) officials (Robert Boyd v. Donald Snyder, No. 99—280—DRH). On January 28, 1999, two weeks after the class action was filed, DOC began to investigate the October 19, 1998, incident. On March 26, 1999, DOC sent a referral letter to the Alexander County State's Attorney recommending that Fields be criminally prosecuted for the incident. Criminal referrals were also made on two of Fields' coplaintiffs in the civil litigation. During pretrial motions it was agreed that (1) there were 389 nonviolent inmate-on-staff assaults between Tamms' opening in March 1998 and when charges were filed against Fields, (2) only eight or nine inmates from Tamms have ever been criminally prosecuted for aggravated assault and battery for alleged improper contact with Tamms correctional officers, and (3) Fields and his two coplaintiffs make up three of that group.

Fields sought an evidentiary hearing and further discovery regarding the selection and referral of Tamms cases for prosecution. The trial court found that Fields failed to make a *prima facie* showing that the prosecutor had improper motives, and the court denied Fields' motion. In Fields' motion for reconsideration, Fields argued that there was clear evidence that DOC had the ability to prevail upon the prosecutor to prosecute those whom DOC selects. The trial court denied Fields' request for reconsideration.

Prior to the trial, the State argued that Fields should be shackled during his jury trial. The trial court ruled that Fields' legs would be shackled, and the court ordered that the courtroom be arranged in such way so that the jury could not see the shackles. In addition, the trial court ordered a number of uniformed guards stationed in the courtroom. One guard was behind the defense table, one guard was at each entrance to the courtroom, and a group of guards was seated in the front row of the spectators' seats.

The trial consisted of testimony from both of the corrections officers involved and one corrections officer who witnessed the incident. The defense laid out during the opening statement and the closing argument was that the incident was so insubstantial that it should not result in criminal liability. During his closing argument, the prosecu-

tor stated, "[T]o suggest that no crime was committed, a little incident as was made mention of in the defendant's opening statement, *** is insulting to your intelligence." The prosecutor also stated, "[The defense's theory] simply does not make any legal or logical sense whatsoever." Also, in rebuttal, the prosecutor added, "How dare this attorney try to insult your intelligence and your sense of right and wrong by suggesting this defendant has a right to act in the way he clearly has." The trial court found that the prosecutor's comments during closing argument were harmless error. Fields appeals.

## Analysis

### 1. Selective and Vindictive Prosecution

■ Selective prosecution and vindictive prosecution, though often argued simultaneously, are actually two separate claims. "[S]elective prosecution requires a showing that the defendant '(1) ... [was] singled out for prosecution while other violators similarly situated were not prosecuted; and (2) the decision to prosecute was based on an arbitrary classification such as race, religion, or the exercise of constitutional rights.' " *United States v. Monsoor*, 77 F.3d 1031, 1034 (7th Cir. 1996), quoting *United States v. Cyprian*, 23 F.3d 1189, 1195 (7th Cir. 1994). Vindictive prosecution exists if the defendant can show that the prosecution was pursued in retaliation for the exercise of a protected statutory or constitutional right. *Monsoor*, 77 F.3d at 1034. In determining if the prosecution was retaliatory, a court will look at "whether '(1) the prosecutor harbored genuine animus[ ] and[,] (2) absent this motive, defendant would not have been prosecuted.' " *Monsoor*, 77 F.3d at 1034, quoting *Cyprian*, 23 F.3d at 1195. Fields is only entitled to a hearing on either claim if he offers " 'sufficient evidence to raise a reasonable doubt that the government acted properly in seeking [to prosecute]' " (*Monsoor*, 77 F.3d at 1034, quoting *United States v. Benson*, 941 F.2d 598, 611 (7th Cir. 1991)).

■ Fields argues, as did the defendant in *Monsoor*, that it is not required that the prosecutor *himself* harbor animus against the defendant but that if the referring agency harbors the animus, it can be imputed to the prosecutor. See *Monsoor*, 77 F.3d at 1034. However, the court in *Monsoor* went on to clarify that such animus may be imputed only when a defendant can establish that the agency in some way prevailed upon the prosecutor to make the decision to prosecute. *Monsoor*, 77 F.3d at 1035.

■ In the case *sub judice*, Fields conceded at a motion hearing that (1) he is not alleging any type of misconduct by the prosecutor and (2) the prosecutor "in most cases" does make an independent determination of whether to prosecute an inmate after receiving the referral let-

ter from DOC. Fields suggests, however, that it is DOC that makes the decision of whether to prosecute an inmate at Tamms and then prevails upon the prosecutor to do so.

Fields discusses in his brief several theories supporting this argument, including that "[the prosecutor] has never declined to prosecute a case referred by DOC because of its independent judgment" and that "[a] portion of the Assistant State's Attorney's salary is paid [under a statute] which required that Assistant to perform services 'in connection with' Tamms." These theories, however, fail to establish a sufficient nexus between DOC and the prosecutor's actions, which is required to show that DOC prevailed upon the prosecutor. See *Monsoor*, 77 F.3d at 1035.

Fields' argument is tenuous at best, with the only linking piece of evidence being the letter sent by DOC to the prosecutor referring the case for criminal prosecution. This letter alone is not enough to make a *prima facie* showing of the prosecutor's improper motives. Fields does not present any evidence of collaboration between DOC and the prosecutor. See *Monsoor*, 77 F.3d at 1035. Since Fields' motion failed to set forth a colorable basis for concluding that his prosecution was selective or vindictive, we conclude that no further discovery is required, and we affirm the decision of the trial court.

### 2(a). The Shackling of a Defendant

Fields' second argument on appeal is that he was denied a fair trial because of the type of security measures taken in the courtroom. Fields' first contention is that requiring him to wear shackles on his legs denied him a fair trial. A defendant may be shackled when (1) there is reason to believe that he may attempt to escape or he may pose a threat to the safety of the people in the courtroom or (2) it is necessary to maintain order in the courtroom during the trial. *People v. Boose*, 66 Ill. 2d 261, 266, 362 N.E.2d 303, 305 (1977).

The trial judge has a great amount of discretion in determining if physical restraints are required and, if so required, what types of restraints are necessary, considering all of the circumstances. *Boose*, 66 Ill. 2d at 266, 362 N.E.2d at 305. The trial judge must take into consideration a variety of factors in making this determination, including, but not limited to: (1) the seriousness of the charge, (2) the defendant's temperament and character, (3) the defendant's age and physical attributes, (3) the defendant's past record, (4) any history of past attempted and completed escapes, (5) the nature and physical security of the courtroom, and (6) the adequacy and availability of alternative remedies. *Boose*, 66 Ill. 2d at 266-67, 362 N.E.2d at 305-06.

The only question for us to consider is whether the trial judge

abused this discretion in requiring Fields to wear shackles during the trial. See *Boose*, 66 Ill. 2d at 267, 362 N.E.2d at 306. We conclude, based on the record before us, that there was no abuse of discretion and that wearing the shackles did not deny Fields a fair trial.

Fields contends that the evidence which the State introduced in support of its request for shackling, specifically, his previous convictions for violent crimes and numerous disciplinary tickets (several for assaults on corrections officers at Tamms), is not a sufficient basis for shackling Fields. Citing *Boose*, 66 Ill. 2d at 267, 362 N.E.2d at 306, defendant states, "The simple fact that a defendant is accused of a violent act does not justify shackling." However, in *Boose*, the court noted, "[t]here is nothing to suggest violent behavior before or during the trial." *Boose*, 66 Ill. 2d at 268, 362 N.E.2d at 306. Here, on the other hand, Fields has consistently had violent tendencies throughout his years with DOC and specifically since being at Tamms. The evidence presented by the State supports several of the factors that the trial judge should consider in making the determination regarding restraints. In particular, it focuses on Fields' temperament and character and the nature of the charge. Here, Fields was charged with two counts of battery on a corrections officer. In addition, he had a clear history of violent behavior, with 11 disciplinary reports for assaultive behavior, 7 on corrections officers, in the less than two years he had been at Tamms.

Fields argues that nothing in the record shows that he would have done or said anything to disrupt the judicial process or offend the dignity of the proceedings. While it is true that Fields had not acted violently during pretrial matters for this case, the trial judge was attempting to balance the level of security required with Fields' right to a fair trial. This balancing is illustrated by the modification of the order for restraints. The trial judge had initially ordered Fields to have his legs shackled and one of his arms immobilized. However, before the trial began, the trial judge modified the order for restraints so that Fields was allowed the use of both of his arms, thus reducing the possibility of prejudicing the jury and allowing Fields to assist counsel during his trial. Thus, the record supports the trial judge's order requiring Fields to wear shackles, and we conclude that this did not deny him a fair trial.

## 2(b). Uniformed Guards in the Courtroom

Fields' second issue regarding the security measures taken involves the presence of uniformed guards in the courtroom. It is "a common courtroom practice" to have uniformed guards present. *People v. Friesland*, 130 Ill. App. 3d 595, 598, 474 N.E.2d 365, 867 (1985),

*aff'd*, 109 Ill. 2d 369, 488 N.E.2d 261 (1985). In fact, the United States Supreme Court has stated, "Our society has become inured to the presence of armed guards in most public places," and the Court has noted that human experience suggests that a case-by-case approach is appropriate to determine whether the presence of guards is prejudicial. *Holbrook v. Flynn*, 475 U.S. 560, 569, 89 L. Ed. 2d 525, 535, 106 S. Ct. 1340, 1346 (1986). Additionally, although it may be preferable for guards to wear civilian clothes rather than uniforms, it is not reversible error merely because the guards wear uniforms. *Friesland*, 130 Ill. App. 3d at 598, 474 N.E.2d at 867.

The defense presents three arguments focusing on this issue. First, Fields argues that the number of uniformed guards located in the courtroom during the trial denied him a fair trial. Next, Fields suggests that the trial judge did not consider him to be much of a threat to be violent, as evidenced by the fact that the trial judge had already reduced the restraints Fields was required to wear. Last, Fields argues that having numerous guards present while already requiring him to be shackled was unnecessary and therefore prejudicial.

The record shows that the trial judge had an open dialogue with both parties regarding both the presence and the number of uniformed guards. He stated specifically that he was attempting to balance the rights of the defendant to a fair trial with the level of protection he felt necessary. The defendant does not cite in his brief, nor have we been able to find in our research, any case that states an absolute limit on the number of uniformed guards. Cases that analyze this issue range from one guard seated at the counsel table (see *People v. Glasco*, 66 Ill. App. 2d 445, 214 N.E.2d 495 (1966)), to a South Carolina case where the trial judge allowed 36 law enforcement officers (two-thirds in uniform) to be located in and around the courtroom (see *State v. Gore*, 257 S.C. 330, 185 S.E.2d 826 (1971)). In support of his second argument, Fields cites to *State v. Borman*, a Missouri case, which held that it was an abuse of discretion for the trial court to permit the defendant to be handcuffed and shackled and guarded by six or seven uniformed guards during the trial. *State v. Borman*, 529 S.W.2d 192 (Mo. App. 1975). We can distinguish Fields' situation from that case, however, based on the fact that the defendant in *Borman* wore handcuffs that were visible to the jury, while the trial judge here did not find handcuffs to be necessary. See *Borman*, 529 S.W.2d at 193. Above all else, the trial judge has discretion in making decisions regarding the safety and security of the courtroom. We will not subvert that discretion absent good reason. Therefore, we conclude that Fields was not denied a fair trial due to the presence of numerous uniformed guards in the courtroom.

### 3. Closing Argument

■ Lastly, we address the defendant's argument regarding the prosecutor's statements during closing argument and rebuttal. Generally, counsel is given great latitude in presenting his or her closing argument to the jury. *Black v. Laggren*, 313 Ill. App. 3d 39, 44, 728 N.E.2d 1208, 1213 (2000).

During the opening statement and the closing argument, the defense counsel characterized the incident at issue as being so insubstantial that it should not result in criminal liability. The prosecutor then made several statements during closing argument that not only attacked this theory of defense but also personally attacked the defense counsel. At issue were the following statements: (1) "[T]o suggest that no crime was committed, a little incident as was made mention of in the defendant's opening statement *** is insulting to your intelligence," (2) "[The defense's theory] simply does not make any legal or logical sense whatsoever," and (3) "How dare this attorney try to insult your intelligence and your sense of right and wrong by suggesting this defendant has a right to act in the way he clearly has." A closing argument must be clearly improper or prejudicial in order to warrant a reversal of the judgment. *Black*, 313 Ill. App. 3d at 44, 728 N.E.2d at 1213. The trial court found the comments made by the prosecutor to be improper, but it held that they were harmless error because they did not prejudice the jury. We agree and conclude that these comments did not deny Fields a fair trial.

### Conclusion

For the aforementioned reasons, we conclude that no further discovery was required, because the defendant failed to make a *prima facie* showing of selective and vindictive prosecution, and that the defendant was not denied a fair trial because of the type of security measures taken in the courtroom or by the prosecutor's comments during closing argument. We therefore affirm the defendant's convictions and sentences for aggravated battery of a corrections officer.

Affirmed.

HOPKINS and KUEHN, JJ., concur.