UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph C. DICKERSON, Defendant–Appellant.

No. 91–2425.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 24, 1992.
Decided Sept. 14, 1992.

James M. Warden (argued), Asst. U.S. Atty., Office of U.S. Atty., Indianapolis, for plaintiff-appellee.

Jack F. Crawford (argued), Indianapolis, for defendant-appellant.

Before CUMMINGS, EASTERBROOK, and MANION, Circuit Judges.

MANION, Circuit Judge.

Joseph C. Dickerson was indicted on December 19, 1990 for two counts of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d) and two counts of use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). Before trial, Dickerson moved to dismiss the indictment and to suppress evidence which had been seized from his home. The district court denied these motions. Shortly thereafter, while reserving the right to appeal the district court's denial of his two pretrial motions pursuant to Fed.R.Crim.P. 11(a)(2), Dickerson pleaded guilty to the two bank robbery counts and one of the firearm counts; he was sentenced to 156 months imprisonment. This appeal followed. Because we find that the district court properly denied Dickerson's motion to dismiss the indictment and motion to suppress evidence, we affirm his conviction.

## I. Background

The facts, as the district court found them, are as follows: At about 11:00 a.m. on November 28, 1989, $7,750 was stolen from a branch of the Federal Credit Union in Indianapolis, Indiana. The tellers described the robber as a black male, carrying a blue steel revolver and wearing a women's mid-calf length coat and brimmed hat. The tellers described the coat as dark or speckled, or salt and pepper. They described the hat as being dark or black with a ribbon band and bow. They also said the robber was wearing dark sunglasses with multi-colored frames and was carrying a blue denim purse.

William Anderson, a customer, was entering the credit union just as the robber was making his escape. He saw a black male, wearing a brimmed hat and a long coat and carrying a blue denim bag, rush toward the door. Anderson watched as the man left the credit union and entered the passenger side of a "grayish" car which was parked nearby in the emergency lane of Interstate 69. Anderson went into the credit union and quickly learned that it had been robbed. Since he was unable to conduct his business, Anderson left the credit union and drove onto I–69 where he immediately saw the robber's car. He caught up with the car and took down the license plate number; he also observed that the hood of the car was "popped open a little bit." Shortly thereafter, Anderson called in this information to the police.

Meanwhile, in response to an alarm which a teller at the credit union had triggered, Lieutenant John Moore and other members of the Marion County Sheriff's Department along with Federal Bureau of Investigation agents W. Timothy Pitchford and Rufus Smith arrived on the scene. During the first thirty to forty minutes after the robbery, the law enforcement officials interviewed the tellers who wit-

nessed the robbery, talked to Anderson, and checked the vehicle registration for the license plate number phoned in by Anderson. The license plate number was registered to a silver Cadillac owned by defendant Dickerson at 4858 North Hillside, Indianapolis, Indiana.

Armed with all this information, the law enforcement officials picked up Anderson and headed for 4858 North Hillside. When they arrived, at around 12:40 p.m., six officers positioned themselves around the house, but out of sight, to make sure that no one entered or left. A silver Cadillac was parked behind the house. Lieutenant Moore checked the hood of the Cadillac and found that it was hot to the touch although the temperature that day was between 20 and 30 degrees, Fahrenheit. Anderson identified the Cadillac as the same car that he had seen at the scene of the robbery and on the interstate. He told the law enforcement officers that the car appeared to be the same one because it had the same license plate and had the same slightly popped hood.

Agent Pitchford, accompanied by three other police officers, then went to the front door and knocked loudly. Pitchford had his nickel-plated Smith and Wesson .357 revolver drawn and at his side; the other three officers also had their guns drawn, and one had a shotgun in a forward position across his body. After a second series of knocks, a black male came to the door and looked through its glass. Agent Pitchford held his FBI credentials up to the glass and asked for Dickerson. The man inside the house opened the door about one foot, and Pitchford stuck his foot inside the open door. The man, who identified himself as Dickerson, was naked. He told the officers that he did not have any clothes on and needed to get dressed before he could talk to them. Dickerson also indicated that he was with a woman in the bedroom in the back of the house and that she was naked too. From his position outside the front door, Agent Pitchford was able to see a

woman in the bedroom, but she was fully clothed.

Pitchford then requested permission to enter the house. Dickerson said "okay" or "all right" and opened the door further. Dickerson then made a hand motion indicating that Pitchford could enter the house. Dickerson went to the bedroom to get dressed. Pitchford followed Dickerson into the bedroom while the other officers conducted a security search of the house. In the bedroom, Pitchford noticed a hat on the dresser and a pair of sunglasses on a night stand which matched the description given by the tellers and Anderson. The woman in the bedroom, Lisa Butcher, stated that the hat and sunglasses were hers and gave the officers permission to display them to the witnesses. Anderson and the tellers (who had, by then, also been brought to the scene by the police) identified Butcher's hat as resembling the one worn by the robber. When Agent Pitchford asked Dickerson about the Cadillac, Dickerson first stated that he had been in bed and the car had been at the house all morning. When confronted with the fact the car's engine was warm, however, Dickerson stated that he had started out for work at 7:00 a.m. that morning but returned at about 8:00 a.m. and called in sick.

At about 1:15 p.m., approximately 35 minutes after entering the house, Agent Pitchford formally asked Dickerson for consent to search the house. Dickerson refused. Pitchford then asked Dickerson to voluntarily stand in a line-up outside the house. Dickerson said he would do so only if he was under arrest. Pitchford then placed Dickerson under arrest, and at about 2:05 p.m., put Dickerson in a line-up outside the house. Dickerson was identified as the robber by the tellers.[1] Agent Pitchford then released Dickerson to the custody of the Marion County Sheriff's Department. Shortly thereafter, Lisa Butcher voluntarily surrendered a woman's grey tweed, full-length coat and a blue denim

---

1. Apparently this was a "drive-by line-up." Dickerson was placed in his front yard with several non-uniformed law enforcement officials. The tellers, sitting in the back seat of a police car, were then driven by the line-up. Dickerson did not challenge this unusual procedure.

purse to Agent Pitchford. She told him that they were hers and allowed him to show them to the witnesses. The coat and the purse were identified by the witnesses as like those they had seen during the robbery.

Finally, at this point, the law enforcement officials decided to obtain a search warrant for the house. Detective Sergeant Newman of the Marion County Sheriff's Department called his office and spoke to another officer, David Scott. Newman related the information developed in the investigation to that point to Scott, who then relayed the information to yet a third officer who prepared a probable cause affidavit. Scott then presented the affidavit to a Marion County Municipal Court judge; at approximately 3:45 p.m., the judge authorized the issuance of a search warrant. The warrant was delivered to Dickerson's residence and executed at around 4:00 p.m. The search, which proved quite fruitful, was completed by about 6:00 p.m. The items seized pursuant to the search included a blue steel .38 caliber revolver with six rounds of ammunition, a shoe box containing $7,211 in currency, and items of clothing that connected Dickerson to a robbery at a branch of the First America Bank of Indianapolis on November 15, 1989.

Later, the surveillance camera film from the credit union was developed and the photographs show Dickerson, gun and purse in hand, leaving the bank. Fingerprints lifted from the teller windows in the credit union were also positively identified as Dickerson's.

Dickerson was first charged and prosecuted in the Marion County Superior Court for the robbery of the Indiana Federal Credit Union and the First America Bank. But the state court prosecution was cut short when the trial court, on October 26, 1990, granted Dickerson's motion to suppress the evidence seized from his home. Shortly thereafter and because of this adverse ruling, the FBI began to consider pursuing federal charges against Dickerson. FBI Agent James Rice, the federal agent then responsible for the case, discussed filing federal charges with the state

prosecutor. The state prosecutor indicated that she had no objection. Just about a month later, the state charges were voluntarily dismissed and custody of Dickerson was turned over to federal authorities. On December 19, 1990, Dickerson was indicted in federal court for both bank robberies.

## II. Motion to Suppress

Dickerson first challenges the district court's denial of his motion to suppress evidence which was seized from his home. Dickerson contends that the items seized during the security sweep of his home should be suppressed because the police had no legal authority to enter the house. The evidence seized pursuant to the search warrant should be suppressed, Dickerson argues, because the warrant was not supported by probable cause.

### A. The Warrantless Entry and Search

■ It is undisputed that four items (namely, the hat, coat, purse and sunglasses) were seized from Dickerson's residence by law enforcement officers before a search warrant was issued. FBI Agent Pitchford and three police officers, all with guns drawn, knocked on Dickerson's front door. Dickerson came to the door totally nude. When Dickerson opened the door, Pitchford stuck his foot inside so that Dickerson could not close it. Agent Pitchford requested permission to enter, and according to Pitchford's testimony, Dickerson consented, both verbally and with a hand motion. The hat, coat, purse and sunglasses were found in plain view during the following security sweep of Dickerson's home.

The Fourth Amendment safeguards an individual's right to be free from warrantless intrusions into his home. *Payton v. New York*, 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980); *United States v. Rosario*, 962 F.2d 733, 736 (7th Cir.1992). An exception to the warrant requirement, however, permits authorities to enter a dwelling without a warrant if they obtain voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Rosario*,

962 F.2d at 736. When the government seeks to rely on consent to justify a warrantless entry or search, it must prove by a preponderance of the evidence that "the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248, 93 S.Ct. at 2059; *see also Rosario*, 962 F.2d at 738 ("The government must prove by a preponderance of the evidence that someone who consents to a search does so freely and voluntarily.").

■ The district court found that Dickerson voluntarily consented to the officers' warrantless entry. Dickerson disputes this finding. We will reverse the district court only if its decision was clearly erroneous. *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991). "Our inquiry is factually based and requires that we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Id.* (citation omitted). Any legal determinations made by the district court, however, are subject to *de novo* review. *United States v. Williams*, 945 F.2d 192, 195–96 (7th Cir. 1991).

The facts of this case give us pause: Could any naked person facing four officers with guns drawn, one with his foot blocking the door open, feel that he was free to tell the officers to get lost? How could Dickerson's consent not be coerced? But the voluntariness of consent "is a question of fact to be determined from all the circumstances," *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2059, and three facts convince us that the district court's conclusion that Dickerson voluntarily consented to the warrantless entry is not clearly erroneous. First, the district court found that Dickerson's nakedness was a "ruse to bolster his alibi that he had been in bed most of the morning with his fiance." Thus, Dickerson was not as vulnerable as he would like us to believe, *see id.* at 229, 93 S.Ct. at 2048 (whether defendant was in a "vulnerable subjective state" is factor to consider in determining whether consent

was voluntary); rather, as the district court found, he was trying to trick the law enforcement officers. Second, after the officers (and their guns) were inside Dickerson's house, he refused to consent to a further search of his home, and third, Dickerson refused to participate in a line-up without first being arrested. That Dickerson was able to twice say "no" to the FBI Agents and police officers after they were already inside his home, makes it unlikely that the consent given while the officers were on his doorstep was coerced. *See United States v. Mendenhall*, 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) ("Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to search, such knowledge was highly relevant to the determination that there had been consent.") (citation omitted); *Schneckloth*, 412 U.S. at 249, 93 S.Ct. at 2059 ("the subject's knowledge of a right to refuse is a factor to be taken into account").

## B. The Search Warrant

■ After Dickerson refused to consent to a full search of his house, the law enforcement officers at the scene did obtain a search warrant. During the search executed pursuant to the warrant, the officers found a hand gun matching the description of the one used by the robber, $7,211 in currency, and clothing which connected Dickerson to a prior robbery at the First America Bank of Indianapolis. Dickerson argues that this evidence should be suppressed because the warrant was not supported by probable cause. This court recently adopted a clearly erroneous standard when reviewing probable cause determinations in warrant cases. *United States v. Spears*, 965 F.2d 262, 270 (7th Cir.1992).

Mindful that a "magistrate's determination of probable cause should be paid great deference by reviewing courts," *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (citation omitted), we nonetheless conclude that Dickerson has a point. The probable cause affidavit presented to the Marion County Municipal Court judge stated only that a wit-

ness saw the robber run from the bank to a car parked in the emergency lane of I-69 and the license plate number of the car was registered to Dickerson at 4858 North Hillside. The affidavit did not even state that the car was parked at the house. Thus, Dickerson persuasively argues, the affidavit provided the issuing magistrate no facts to establish that evidence of a crime could be found inside the residence at 4858 North Hillside. *See Gates*, 462 U.S. at 238, 103 S.Ct. at 2332 (must be "a fair probability that contraband or evidence of a crime will be found in a particular place"); *United States v. Malin*, 908 F.2d 163, 166 (7th Cir.) (affidavit must "allege specific facts establishing a reasonable probability that the items sought are likely to be at the location designated") (citation omitted), *cert. denied*, —— U.S. ——, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). The only nexus between the car and the house is the license registration. The district court held that this was sufficient: since the car was registered to a resident of 4858 North Hillside, it is reasonable to infer that evidence of the robbery could be found at that address. The affidavit certainly established probable cause to search the car, but since it did not state that the car was at the residence, we are doubtful that it established probable cause to search Dickerson's house. *Compare Malin*, 908 F.2d at 166 ("observation of marijuana growing *in Malin's yard* reasonably yielded the conclusion that marijuana or other evidence or marijuana possession would be found in Malin's house").

Even if the affidavit is deficient, however, the evidence found during the search pursuant to the warrant is saved by the good-faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon*, the Supreme Court held that the exclusionary rule does not apply when a law enforcement officer relies, with objective good faith, on a judicial officer's incorrect finding of probable cause and issuance of a search warrant. *Id.* at 922–25, 104 S.Ct. at 3420–22. Evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant will not be suppressed unless "a reasonably well

trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n. 23, 104 S.Ct. at 3420 n. 23. *See also Malin*, 908 F.2d at 166 ("Evidence is not suppressed when a police officer relies in objective good faith on a faulty but facially valid search warrant.").

The district court, as an alternative ground for its decision, found that the authorities at the scene relied on the warrant in objective good faith. We agree. The officers at the scene had more than probable cause to search. They knew that Dickerson's car was parked at the house, had been identified by a witness and its engine was still hot; that the hat, coat and purse found in the house had been identified by witnesses as like those worn by the robber; and that the tellers had identified Dickerson as the robber in a line-up. The officials did not know that all this information had not been passed on to the judge who issued the warrant; they did not see the probable cause affidavit. The law enforcement officials at Dickerson's home, therefore, had every reason to believe, in good faith, that the warrant was supported by probable cause.

### III. Motion to Dismiss the Indictment

Dickerson next contends that the indictment against him should be dismissed for two reasons. First, Dickerson argues that the indictment must be dismissed because he is the victim of a vindictive prosecution; the prosecution was brought, Dickerson claims, in retaliation for his successful challenge of the search in state court. Second, Dickerson argues that the delay between the his arrest and the filing of federal charges violated his speedy trial and due process rights.

### A. Vindictive Prosecution

■ A prosecution is vindictive and a Fifth Amendment due process violation if it is undertaken in retaliation for the exercise of a legally protected statutory or constitutional right. A person cannot be punished "because he has done what the law plainly allows him to do." *United States v. Good-*

*win,* 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982). *See also United States v. Benson,* 941 F.2d 598, 611 (7th Cir.1991) ("The Fifth Amendment has been interpreted to prohibit the government from prosecuting a defendant because of some specific animus or ill will on the prosecutor's part, or to punish the defendant for exercising a legally protected statutory or constitutional right."). In certain cases—where "action detrimental to the defendant has been taken after the exercise of a legal right" and "a reasonable likelihood of vindictiveness exists"—an improper vindictive motive is presumed. *Goodwin,* 457 U.S. at 373, 102 S.Ct. at 2488. Dickerson does not argue, nor could he, that the federal prosecution in this case is presumptively vindictive. *See United States v. Heidecke,* 900 F.2d 1155, 1159–60 (7th Cir.1990) (refusing to presume vindictiveness where, as in this case, there are successive prosecutions by two sovereigns). Thus, to succeed on his vindictive prosecution claim, Dickerson must establish that the federal prosecution was motivated by actual vindictiveness. To prove actual vindictiveness, there must be objective evidence of some kind of genuine prosecutorial animus. *See Heidecke,* 900 F.2d at 1159 (absent a presumption of prosecutorial vindictiveness, "some kind of genuine prosecutorial animus should be directly or indirectly shown"); *United States v. Whaley,* 830 F.2d 1469, 1479 (7th Cir.1987) ("To prove actual vindictiveness, there must be objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights."), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

There is no such evidence in this case. There is no evidence that the federal charges were brought because the prosecutor wanted to engage in self-vindication or to persuade Dickerson to plead guilty. *See Whaley,* 830 F.2d at 1479–80. Dickerson asserts (without any proof) that federal

agents and police were angered by his successful challenge to the legality of the search; since FBI agents and Indiana police officers are not and have no control over federal prosecutors, however, this speculation, even if proven, would not show prosecutorial animus. The sole basis of Dickerson's vindictive prosecution claim, then, is the timing of the federal prosecution. FBI Agent Rice began to explore the possibility of filing federal charges only after he discovered that the state court had granted Dickerson's motion to suppress. Bringing the federal indictment shortly after the state court suppressed the evidence seized from his home, Dickerson argues, creates an inference that the federal prosecution was motivated by a desire to punish him.

If new federal charges were brought against Dickerson after a federal court granted his motion to suppress in a pending federal prosecution, the timing of the new federal charges might raise an inference of actual vindictiveness. *But see Goodwin,* 457 U.S. at 381, 102 S.Ct. at 2493 ("It is unrealistic to assume that a prosecutor's probable response to [pretrial] motions is to seek to penalize and deter."). But courts have recognized that the same is not true where, as in this case, the second prosecution is brought by a different sovereign. *See, e.g., Heidecke,* 900 F.2d at 1159 ("Where there are successive prosecutions by two sovereigns, as in this case, it is improbable that a realistic likelihood of vindictiveness exists."); *United States v. Schoolcraft,* 879 F.2d 64, 68 (3rd Cir.) ("We note that the role of a separate sovereign in bringing charges against a defendant minimizes the likelihood of prosecutorial abuse."), *cert. denied,* 493 U.S. 995, 110 S.Ct. 546, 107 L.Ed.2d 543 (1989); *United States v. Robison,* 644 F.2d 1270, 1273 (9th Cir.1981) ("involvement of separate sovereigns tends to negate a vindictive prosecution claim").[2]

2. Dickerson relies on *United States v. Burt,* 619 F.2d 831 (9th Cir.1980), a Ninth Circuit case decided prior to *Robison.* In that case, the court held that the prosecution could not be vindictive because the decision to file federal

charges was made before the defendant's motion to suppress was granted by the state court. Dickerson contends this holding means that a federal prosecution begun after evidence is suppressed in state court must be vindictive. The

Since armed bank robbery violates both Indiana and federal law, Dickerson could have been prosecuted by Indiana or the United States, by both sovereigns or neither. *See Abbate v. United States,* 359 U.S. 187, 194, 79 S.Ct. 666, 670, 3 L.Ed.2d 729 (1959). The decision to prosecute is within the discretion of each sovereign. And "[t]here is no vindictiveness as long as the prosecutor's decision is based upon the normal factors ordinarily considered in determining what course to pursue." *United States v. DeMichael,* 692 F.2d 1059, 1062 (7th Cir.1982), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1983). There is no indication in the record that the federal prosecution of Dickerson was motivated by anything other than the government's determination that Dickerson was more likely to be convicted in federal court—a factor ordinarily and legitimately considered in deciding whether or not to prosecute. *See Goodwin,* 457 U.S. at 372–73, 102 S.Ct. at 2488; *DeMichael,* 692 F.2d at 1062. The timing of the federal prosecution, alone, cannot change this legitimate exercise of normal prosecutorial discretion into a vindictive prosecution.

### B. Delay

■ Dickerson argues that the indictment should also be dismissed because the delay between his arrest by state authorities on November 28, 1989 and the return of the federal indictment on December 19, 1990 violated his Sixth Amendment speedy trial and his Fifth Amendment due process rights.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." "[T]he Speedy Trial Clause of the Sixth Amendment does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused." *United States v. MacDonald,* 456 U.S. 1, 6, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982). *See also Doggett v. United States,* —— U.S. ——, ——, ——, 112 S.Ct. 2686, 2692, 120 L.Ed.2d 520 (1992) ("the Sixth Amendment

right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution"). In this case, Dickerson was not arrested on federal charges and no federal charges were pending until December 1990. Dickerson's right to a speedy trial on the federal charges, therefore, did not arise until that time. The one-year period between Dickerson's arrest by state authorities on state charges and the return of the federal indictment cannot be the basis of a Sixth Amendment claim.

■ However, in limited circumstances, a "delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment." *MacDonald,* 456 U.S. at 7, 102 S.Ct. at 1501. The Due Process Clause of the Fifth Amendment would require dismissal of the indictment if Dickerson established "that the pre-indictment delay in this case caused substantial prejudice to [his] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). *See also United States v. Rein,* 848 F.2d 777, 781 (7th Cir.1988) (accused must show "(1) that the government delayed bringing the indictment in order to gain a tactical advantage; and (2) that the delay caused him actual and substantial prejudice") (citation omitted).

Dickerson has failed to make such a showing. We agree with the district court that there is no evidence of preplanning by the federal officials. While the federal officials knew of Dickerson's incarceration on the state charges, there is no evidence that they brought federal charges in order to make Dickerson wait longer for trial. Dickerson generally asserts that he was prejudiced by the delay, but this is not enough. He has not established, or even stated with specificity, how he was harmed; there is no evidence in the record that the delay prevented Dickerson from adequately preparing his defense. *See United States v. Doerr,* 886 F.2d 944, 964 (7th Cir.1989)

court in *Burt,* however, explicitly declined to reach the second, more difficult issue, *id.* at 837,

and the Ninth Circuit in *Robison,* as we do here, rejected Dickerson's argument.

("the defendant must point quite specifically to how she was prejudiced, and the defendant's showing must be concrete, not speculative"). Finally, the pre-indictment delay of approximately one year was not extreme and, by itself, is not sufficient to establish a Fifth Amendment violation. *See Marion,* 404 U.S. at 325, 92 S.Ct. at 466 (38–month delay between end of criminal scheme charged and indictment did not violate due process).

## IV.

The district court properly denied Dickerson's motion to dismiss the indictment and motion to suppress evidence. His conviction is AFFIRMED.