UNITED STATES of America, Plaintiff,

v.

Corey D. SIMS, Defendant.

No. 90–Cr–72.
Civ. A. No. 94–C–1255.

United States District Court,
E.D. Wisconsin.

Sept. 11, 1995.

Joseph Wall, Assistant U.S. Attorney, Milwaukee, WI, for Plaintiff.

Corey D. Sims, Florence, CO, pro se.

## ORDER

TERENCE T. EVANS, Circuit Judge, Sitting by Designation.

Eighteen people—13 men and 5 women—were indicted in this case in 1990 for, among other things, allegedly being members of a conspiracy to possess large amounts of cocaine with intent to distribute. One of the major players in the conspiracy was a fellow named Milton Sims, Jr. The case, while pending in the district court, was often referred to as the "Milton Sims conspiracy case."

Milton Sims and one of the codefendants, John Taylor, went to trial before a jury in August of 1990. Milton Sims was found guilty on four of four counts and Taylor on four of five counts. The trial, which I conducted, lasted 10 days.

In addition to the Milton Sims–Taylor trial in 1990, I presided over four additional jury trials involving other defendants in this case in 1991. In January of 1991, Frank Arms, Nate Holloway, Adrienne Ross, and Stella Roberson were tried to a jury for 11 days. Arms and Ross were convicted on five of five counts, Holloway was convicted on four of four counts, and Roberson was convicted on

the only count she faced. In March of 1991, Darryl Eastern was acquitted on two counts after a 4–day jury trial. In April of 1991, Roosevelt Williams was convicted after a 5–day jury trial on three of four counts. Finally, in July of 1991, Sam Ochoa, Gerald Crawford, and Corey Sims went to trial on multiple counts of cocaine distribution and conspiracy. Corey Sims is Milton Sims' brother. Ochoa, Crawford, and Corey Sims were convicted after a 9–day jury trial on several charges against them. Corey Sims' convictions were for conspiracy to distribute in excess of five kilograms of cocaine and a substantive count charging cocaine-related activities.

When the dust settled in this case, five separate juries worked 39 days to resolve the charges against 11 of the 18 defendants named in the case. Most of the defendants who did not go to trial pled guilty and cooperated with the government. Of the 11 defendants who put their fate in the hands of juries, only one had cause to celebrate. Corey Sims, as previously noted, was not the lucky one. On January 13, 1992, I sentenced Corey Sims to 121 months in prison. The term was one month more than the mandatory minimum for the conspiracy conviction and the absolute bottom of his sentencing range under the federal sentencing guidelines.

Eight defendants appealed their convictions. The court of appeals heard arguments in the case in the consolidated appeals on April 9, 1993. Almost one year later, on March 31, 1994, the appeals were resolved in an unpublished order. Although the court did some minor tinkering with the appeals of a few defendants, convictions on all major counts in the indictment were affirmed. Corey Sims' conviction and sentence went undisturbed.

On November 14, 1994, Corey Sims filed a motion for postconviction relief with this court pursuant to 28 U.S.C. § 2255. In his petition, Sims argues that he was denied the effective assistance of counsel before, during, and after his trial. His trial counsel was an appointed attorney from Milwaukee, Mike Barth. On appeal, Sims was represented by a retained attorney, James Devitt. Sims also claims entitlement to relief due to "the district court's failure to abide by the Supreme Court's ruling in *Bourjaily v. United States.*"

As might be expected, the facts in this case are complicated and extended. Rather than repeat them, I reprint here the first several pages of the unpublished decision of the court of appeals in this case. After the facts are reprinted below, I will address the issues raised by Mr. Sims in his petition. The facts as noted by the court of appeals are:

## "I.   FACTS

### "Beginnings of the Conspiracy

"The conspiracy began in the Los Angeles suburb of Gardena, California in approximately 1985 or 1986 and eventually involved the distribution of kilogram quantities of cocaine from Los Angeles to Milwaukee. Tony Love and brothers Milton and Corey Sims began distributing small quantities of cocaine supplied by Saul Ochoa, also known as Jesse. During the early part of 1986, Love was receiving the cocaine and cooking it and both Milton and Corey Sims were distributing it for Love.

"Sometime in the fall of 1986, a Milwaukee native, Terrence Roberson, brought Milton Sims to Timothy Eastern's residence in Milwaukee. At the time, Roberson was living in the Los Angeles area and making frequent trips to Milwaukee carrying kilogram quantities of cocaine for further distribution. Eastern, a high school friend of Roberson's, saw Roberson receive a bag of cash from another individual at Roberson's mother's house in Milwaukee. Roberson stated that the cash represented the proceeds of a one-half kilogram sale of cocaine he was running from Los Angeles to Milwaukee for a man named Fred Hood. Roberson was paid $500 and one ounce of cocaine for every kilogram of cocaine he brought to Milwaukee. Shortly thereafter, Eastern entered the cocaine business with Roberson. Initially, Eastern was supplied by Stella Roberson, Terry's mother. He received for further distribution one-eighth ounce quantities from Stella on several occasions.

"In late 1986 through 1987, Milton Sims also began bringing cocaine to Milwaukee

through airports. Sims started supplying Eastern with small quantities of cocaine. Eastern then switched his source of supply from Stella Roberson to Milton Sims when Sims offered Eastern a better price. The cocaine Sims provided Eastern was further distributed in the Milwaukee area through Nate Holloway and Burt Black. Holloway distributed for Eastern for approximately one month until Eastern stopped supplying him because Holloway's money was often short. Holloway during this time also received some cocaine from Terrence Roberson.

"For a brief time, Eastern switched suppliers from Milton Sims to a Los Angeles drug dealer named Barry Walker, who was also supplied by Saul Ochoa. Eastern received cocaine from Walker through Federal Express, some of which was sent to Nate Holloway's residence on behalf of Eastern. After several months, Eastern terminated his relationship with Walker and eventually resumed his relationship with Milton Sims, who was still carrying cocaine from Los Angeles to Milwaukee on a regular basis.

"At one point, Eastern began traveling to the Los Angeles area to socialize with Roberson and Milton Sims, both of whom, along with Barry Walker, lived in the same apartment complex in Gardena, California. In the spring of 1987, while staying with Terry Roberson, Eastern witnessed a transaction between Roberson and three Hispanic men. At the end of this trip, the three Hispanic men, one of whom was Saul Ochoa, carried a cardboard box containing between four and six kilograms of cocaine to Roberson's apartment. These individuals unpacked the cocaine while Roberson dumped a stack of cash on the table. Saul Ochoa counted the cash and found that it was a few thousand dollars short. Eastern learned from Roberson that the cocaine he was taking to Milwaukee for Fred Hood was supplied by Ochoa.

"**2 Milton Sims, also known as Bud, soon developed a market in the Milwaukee area for his cocaine and cultivated a group of customers. In the beginning Sims had four customers: Jeff Pickett, Frank Arms, James McGee and Gerald Crawford, also known as 'Wee Wee.' As business expanded, Sims started using other individuals to help him distribute cocaine. Rodney Ross, another Gardena, California friend of Milton's, came to Milwaukee to assist Sims. Ross distributed in the Milwaukee area for Sims to individuals such as McGee, Pickett, Arms and Crawford. Eventually Ross was replaced in Sims' organization by a man named Darryl Ellison, also known as 'Tooter'.

"On one occasion, Eastern and Sims went to a female customer of Sims, Pam, with a couple ounces of cocaine. At Pam's, 'Wee Wee' came to the house to pick up the cocaine. On another occasion, 'Wee Wee' came to Nate Holloway's house with a cassette case full of cash. Eastern learned that the cash was the proceeds from a half kilogram of cocaine which Sims had provided to Crawford. Eastern understood 'Wee Wee' to be one of Sims' smaller customers who had worked his way up from buying ounce quantities to half kilogram quantities.

"Sometime in the summer of 1987, Roberson, Sims and Eastern met a Milwaukee drug dealer named Errol Jackson at a Milwaukee area nightclub. Roberson had a conversation with Jackson about cocaine prices and told Jackson, then a customer of Fred Hood, that he was paying Hood too much money. Shortly after this, Roberson was arrested at Los Angeles International Airport while transporting six kilograms of cocaine bound for Milwaukee. Following the arrest of Roberson, Sims and Eastern again talked to Jackson sometime in the summer of 1988. Jackson told them he was looking for a source of cocaine. Sims hesitated to deal with Jackson because he was too flashy. However, Sims told Eastern that he could do business with Jackson if he wished. Two separate one kilogram deals took place between Eastern and Jackson. Sims supplied the cocaine for both deals. The second transaction involved Nate Holloway, who delivered the kilo to Jackson for Eastern. After the second transaction, Eastern stopped delivering to Jackson and was replaced as a middleman by Holloway. Sims and Holloway continued to do business with Jackson. In early 1989, Jackson called Holloway from jail. Holloway contacted Sims about the phone call and Sims became suspicious.

Sims feared that Jackson was cooperating with the authorities and was attempting to set them up.

"Over the course of the conspiracy, Eastern also did two or three kilogram sized deals with another customer of Sims, Frank Arms. Eastern first met Arms at Stella Roberson's house. There, Eastern witnessed Milton Sims 'front' Arms a couple of ounces of cocaine and was told by Sims that Arms could be trusted. On the first deal, Eastern, under Sims' direction, obtained a kilogram of cocaine, met Frank Arms and exchanged the cocaine for a bag full of money. A second deal involved Eastern picking up money from Arms which was owed to Sims for cocaine. Another time, 'Tooter' and Eastern retrieved a sack of cash totalling between $40,000 and $45,000, and on yet another occasion they took a kilo of cocaine to Arms' sister's house.

"The Federal Express System

"**3 Sometime early in 1988, McGee, one of Sims' customers, recruited three women, Linda Williams, Rita Brown, and his girlfriend, Carolyn Baker, to assist Milton Sims in the Milwaukee side of his cocaine distribution business. All three women received kilogram and multi-kilogram packages of cocaine via Federal Express from Milton Sims and his associates in Los Angeles. All three women would also send large sums of cash (up to $80,000) given by McGee, Sims, 'Tooter', Roosevelt Williams, and Eastern, to addresses in California provided by McGee. In exchange for their services, the women would be paid and sometimes given cocaine for their personal use.

"Linda Williams received between three and five Federal Express packages each containing one or two kilograms of cocaine. All of the packages were sent in the name of a fictitious person. Williams would know the name in advance from her Los Angeles connections. Williams would call a beeper number and enter her phone number to be displayed on the beeper. She would then receive a call from a female or Milton Sims informing her of the name on the package and the date the package was to arrive. After receiving the package, she would burn the receipts and hide the package until either

Frank Arms or 'Wee Wee' came to pick it up. Crawford and Arms came to her house approximately three or four times to get the cocaine. Crawford was always required to pay Williams up front for the cocaine, but on one occasion, Arms was 'fronted' a shipment.

"During the course of the Federal Express system, in April of 1988, Gardena, California police officers were investigating cocaine related activities of Corey Sims. On April 26, 1988, the officers utilized a confidential informant named Kenny to make a controlled purchase of a half ounce of cocaine from Corey Sims. Subsequently, the agents obtained and executed a search warrant for Milton and Corey Sims' residence. Found in the search was a half-kilogram of cocaine in Corey Sims' bedroom, two rifles, and, in another room of the house, a purse with $9,200 in cash. Agents also found a Federal Express package sent from Milwaukee by 'J. McGee' to 'Future Sims' containing $21,900 in cash. At this time, Milton Sims told the police officers that the money and the cocaine were owned by Corey Sims and that Corey Sims was a drug dealer.

"On July 7, 1988, DEA agents in Memphis, Tennessee intercepted two Federal Express packages of cocaine, containing three kilograms each, en route from Los Angeles to Milwaukee. The day before, DEA agents had received a call from a Federal Express supervisor who had informed them of the packages. The DEA in Milwaukee then attempted to make a controlled delivery of the packages to the Milwaukee addresses. However, the logistics of this attempted controlled delivery caused the packages to be late. This alerted Sims and his associates that law enforcement officials might have intercepted the packages. Both Sims and McGee advised Williams and Brown not to accept the packages. Williams refused to accept one package when an undercover DEA agent, posing as a Federal Express employee, attempted to deliver it. The package was addressed to 'Sheryl Brown,' and Williams simply informed the agent that no person by the name of Sheryl Brown resided at that location. The other package, destined for Rita Brown, could not be delivered

because she mistakenly provided the Los Angeles people with a non-existent address.

"**4 Following this incident, on July 31, 1988, police stopped Corey Sims at Memphis International Airport and seized $15,665. Corey had travelled to Memphis to pick up the proceeds of a kilogram of cocaine sent to Memphis by Ann Love on behalf of Milton Sims. Corey Sims, however, told police that the cash was the proceeds from the sale of some of his father's land and a car. During this period, Corey Sims also made a trip to Milwaukee to distribute cocaine. 'Tooter' likewise travelled to Milwaukee carrying a kilogram of cocaine for Corey. Eastern received half of that kilogram and paid Corey $4,000 in Milwaukee. Eastern eventually wired the remaining $3,000 he owed Corey for the deal through Western Union. Meanwhile, Corey Sims continued selling cocaine in the Los Angeles area.

"Tony Love, Milton Sims' Gardena, California associate, came to Milwaukee sometime in mid summer of 1988, and stayed at Eastern's mother's house. Love came to Milwaukee to oversee one kilogram of cocaine which was sent from Saul Ochoa in Los Angeles through Federal Express to a Milwaukee apartment belonging to Eastern's girlfriend. Eastern received one-half of the kilo and Rodney Ross received the other half. During Tony Love's stay in Milwaukee, he, Rodney Ross, Milton Sims and Nathan Holloway went to a Milwaukee night club and met Lisa Spivy, who became romantically involved with Rodney Ross. Spivy sent boxes of cash to Los Angeles on behalf of Ross. In mid September of 1988, Tony Love passed away in Los Angeles and both Milton and Corey Sims attended his funeral.

"The Courier System

"Sometime following the loss of six kilograms of cocaine through Federal Express, the Sims organization switched to a system of couriers. The first courier was Tony Love's mother, Ann Love. Ann Love was sixty two years old, with five children and sixteen grandchildren, when she started her association with the Sims organization. In the summer of 1988, she mailed a package for Milton Sims containing cocaine to Memphis, Tennessee. In addition, Sims had her

mail a second package of cocaine, this one to Milwaukee. Ann Love received $50 for each package. She also picked up a Federal Express package containing money sent from Milwaukee and delivered it to Landry Hampton's communications shop for Milton Sims.

"At the end of August, 1988, Milton Sims asked Ann Love to accompany 'Tooter' with a suitcase containing cocaine on a trip to Milwaukee by Greyhound bus. When they arrived in Milwaukee, she and 'Tooter' were met at the bus depot by Nate Holloway and driven to Holloway's residence. Holloway then took Ann Love to a Milwaukee hotel and paid for her room. The next day, Holloway came to the hotel and gave Love and 'Tooter' additional cash to fly back to California.

"Following her son Tony Love's death, Milton Sims again asked Ann Love to come to Milwaukee. After flying to Milwaukee, she met Milton at a hotel and received a bag of cash totalling $100,000. Milton instructed her to give the cash to 'Jesse,' whom Love knew to be Tony's neighborhood acquaintance, Saul Ochoa. She flew back to Los Angeles with the cash and gave Saul Ochoa the money at her daughter Beverly Ann White's house. Saul counted the money and stated that it was between $30,000 and $50,-000 short. Saul then called Milton Sims, who was in Milwaukee, and began swearing at him regarding the shortage, criticizing Sims for having too many people handling his money.

"**5 Around November of 1988, Milton Sims again asked Ann Love to transport cocaine to Milwaukee. Sims delivered ten kilograms of cocaine to Love with the expectation that she would bring the cocaine by bus with 'Tooter' to Milwaukee. Love was to receive $10,000 for her efforts. 'Tooter', however, never showed up at the bus depot, so instead of traveling to Milwaukee with the cocaine, Ann Love put the cocaine unaccompanied on the bus. She then flew back to her home in Texas and called Milton Sims advising him of what had transpired. She then called the Milwaukee Police Department and told them about the cocaine. A police officer instructed Love to send the claim

check back to its owner, which she did, sending it to Sims via Federal Express to Landry Hampton's communications business. After finding out, Milton Sims called Ann and threatened to have her killed. A Milwaukee police detective, Ernie Meress, who took the call from Love, retrieved the suitcase when it arrived in Milwaukee. He opened the suitcase and found it to be empty. Approximately two days later, an unidentified individual attempted to take possession of that suitcase.

"On November 8, 1988, Milton Sims met Beverly Ann White. He came to her residence with Corey Sims, Adrienne Ross, and 'Tooter'. Milton told her that he had given her mother ten kilograms of cocaine which she was supposed to take to Chicago, but did not. Sims stated that he obtained the cocaine from Saul Ochoa and that he was required to pay Ochoa for this loss. Sims wanted Beverly to talk to Ann Love to get back the cocaine or his money. Sims told Beverly that if Ann did not come up with the cocaine or his money, the people from whom he had received the cocaine might hurt Beverly or her children. Sims also informed Beverly that the ten-kilogram transaction had occurred at Beverly's house. Two days after this conversation, Sims called Beverly and she told him she was going to call the police.

"After the ten-kilogram loss, Adrienne Ross, Milton Sims' Los Angeles girlfriend, started taking a larger role in Sims' organization. She began handling the money side of the business and also began handling the couriers. The first courier after Ann Love was Roosevelt Williams, a retired Greyhound bus driver. Another individual, Thomas Green, known to everyone as 'Dog,' also began running cocaine for Sims. Adrienne handled the purchase of train and bus tickets for the couriers and eventually began handling the cocaine, packing it into suitcases with spices and other items to mask its scent.

"Adrienne Ross also had numerous contacts with Saul Ochoa and his workers over the course of her participation in Sims' organization. Ochoa employed 'workers' to directly handle the cocaine and cash. Adrienne dealt with four of these workers. Most of her contact with Ochoa involved cash used to repay Ochoa for cocaine. About half of the time, she observed Ochoa personally overseeing the activity. When the activity involved cocaine, she would ordinarily switch cars with one of Ochoa's workers, which would contain cash, and would take the car containing cocaine. During these deals, Ochoa would oversee the transaction in a second car.

"**6 Adrienne did one face to face cocaine transaction with Ochoa set up by Milton Sims sometime after December of 1988. Sims instructed her to exchange cars with Ochoa. She drove to a restaurant in a rented car containing the cash. She then met Ochoa and his workers and gave her car keys to one of the workers. Ochoa pointed out his car and gave her the keys. She then drove the car (which she knew contained cocaine) to Rodney Ross' house.

"John Taylor, Milton's uncle, also became a courier. On March 15, 1989, at Mitchell International Airport in Milwaukee, airport security agents stopped Taylor and questioned him about the contents of his bag. The x-ray machine had disclosed a suspicious shape. Agents opened the bag and found two shoe boxes wrapped in tape containing envelopes with $69,950 in cash. Taylor told the agents that he was running an errand for an individual named 'Bob,' whom he had known a couple of years but did not know his last name, and that he was unaware of what was inside the taped shoe boxes. Security confiscated the money and gave Taylor a receipt. Sims hired an attorney to try to get the money back. Sims and Taylor then concocted a story about the money stating that it was the proceeds from a sale of property.

"Following this, in August of 1989, Los Angeles law enforcement officials began working with Kenny, the confidential informant, to infiltrate Sims' organization. The target of the investigation was John Taylor. Kenny introduced an undercover officer to Taylor. On August 8, the officer and Taylor met at a restaurant and began negotiations for the purchase of cocaine. The officer offered Taylor $6,000 in cash for a quarter kilogram of cocaine. Taylor indicated he was willing to do the deal. However, negotiations broke off when Taylor demanded the money up front. Eventually, on the following day,

the two agreed to use Kenny as a go-between. Kenny would exchange the cocaine for the cash and then give the cocaine to the officer. During the deal, Taylor noticed he was being tailed while driving with Kenny to pick up the cocaine and Taylor canceled the deal. After the breakdown with Taylor, Kenny introduced the officer to an individual known as 'Duck' and the two began negotiations. As the deal was consummated outside 'Duck's' residence, John Taylor arrived in his car, looked at the two and disappeared up 'Duck's' driveway.

"Rita Brown and Carolyn Baker also became couriers for Sims, running cash to Los Angeles and cocaine back to Milwaukee. Brown began travelling to Los Angeles for Sims in approximately September of 1989. She made approximately seven trips to Los Angeles for Sims. On one occasion, Brown went to Sims' apartment in Los Angeles and received a duffle bag full of cocaine from Adrienne Ross, who then took her to the bus station. Eventually, Brown started using a double girdle (two girdles sewn together) in which she could conceal large sums of cash. She received $500 for transporting cash to Los Angeles. If she returned to Milwaukee with cocaine she was paid an additional $1,500. Milton Sims or 'Tooter' paid her for her services. On her last trip to Los Angeles, in February of 1990, Corey Sims and 'Tooter' greeted Rita and took her to Milton Sims' apartment, where 'Tooter' and Corey counted the cash she had brought from Milwaukee.

"**7 Meanwhile in Milwaukee, on November 26, 1988, a Milwaukee police officer gave chase to a Ford Bronco driven by Gerald 'Wee Wee' Crawford after Crawford had run a red light. Crawford eventually stopped the car, exited quickly and began to talk to the officer. As this transpired, a female passenger exited the Bronco and began walking away. The officer ordered her back. As she started to comply, Crawford began talking to the officer even more rapidly. While the officer attempted to handcuff Crawford, the female fled. The officer chased her and Crawford himself fled as well. The officer eventually caught up with the female and in the ensuing struggle, Crawford yelled to the female and she then threw a white softball-shaped object to Crawford. The officer arrested her and found a white powdery substance covering her and the area of her arrest. A back-up officer came to the scene and gave chase to Crawford. Prior to apprehending Crawford, he observed Crawford (who was standing on a porch) throw an object into the air which then began to disintegrated into the night-time rain. After throwing the object, Crawford wiped his hands on his jacket. The officers hurriedly scraped together the white powdery substance before the rain could wash it away. Analysis done on the powder identified the substance to be cocaine.

"On February 20, 1990, two Milwaukee police officers stopped a vehicle in Milwaukee which was heading the wrong way on a one-way street. Inside the vehicle were Gerald Crawford and two other individuals. After stopping the vehicle, the driver quickly exited and began talking to the officers. One of the officers approached the car and observed a man in the back seat scooping up handfuls of cash which were spread across the entire floor of the car, with most of it settled in the rear floor area. It appeared to the officer that the man in the front seat of the car, Crawford, had thrown the cash from the front seat area into the back. The officer then ordered Crawford out of the car and conducted a protective search of his person. Crawford was carrying a cocked and loaded .32 caliber semi-automatic pistol. The cash totalled approximately $2,775.

"Carolyn Baker also began traveling to Los Angeles in approximately September or October of 1989. She made six or seven trips to Los Angeles carrying cash. She also wore the double girdle. On three or four occasions she returned to Milwaukee with cocaine. Milton Sims, Adrienne Ross or 'Tooter' provided the cocaine for her. Normally, the cocaine would be transported in a carry-on bag on an Amtrak train to Chicago. In Chicago someone would pick up Baker and drive her to Milwaukee. On arrival in Milwaukee with the cocaine, she would call Sims. One time, Sims contacted her and asked her to bring the cocaine to a bar. Sims, 'Tooter,' and Rodney Ross met her

there. Outside the bar she gave Ross one kilogram of cocaine.

"On March 7, 1990, Baker was arrested at the Amtrak station in Los Angeles before boarding a train bound for Milwaukee with four kilograms of cocaine. Agents questioned Baker and after implicating various persons, she agreed to cooperate with the authorities. Rich Andrews, a DEA agent based out of Milwaukee, took custody of Carolyn Baker for the purpose of making a controlled delivery of the cocaine. Andrews and other agents returned with Baker to her Milwaukee residence and under the agents' directions, she placed a call to Milton Sims' beeper. Eventually Sims and 'Tooter' arrived at Baker's house. After they entered, Baker alerted both Sims and 'Tooter' that she had been arrested and that police were in the house. Both Sims and 'Tooter' fled. 'Tooter' escaped, but Sims was apprehended. Sims told the agents that his name was 'Byron Edmond,' and a subsequent search yielded a California driver's license bearing a photograph of Sims and the name 'Byron Edmond.'

"**8 Meanwhile, in Los Angeles, officers were investigating the link between Baker and the Sims organization. Law enforcement officials determined that she had been staying at the Courtesy Inn Hotel in Los Angeles in room 225. They proceeded to the hotel and noticed that the room was still occupied. The next day, March 8, 1990, an agent stood outside room 225 and heard male voices. He observed four males exit the room, go into a parking lot and enter two separate cars. One of these individuals, later identified as Corey Sims, entered a blue Chevrolet which was later determined to be registered to Milton Sims. Further detective work revealed that the car had later been sold to 'Tooter.'

"On February 22, 1991, Gardena police officers observed five Hispanic males standing around a street corner in Gardena. One officer recognized Saul Ochoa. The officers observed Ochoa and the others enter a car with another driver. The officers stopped the car and questioned Ochoa and the others. Ochoa told the police he was "Martin Garcia" and produced a false ID card bearing his

photo and the name 'Martin Garcia.' Ochoa was then taken into custody an arrest warrant from the Eastern District of Wisconsin. Ochoa was searched and a wad of $1,000 cash was found in his front pocket and a mobile phone was found in the car.

"The Handgun

"In 1986, Roosevelt Williams purchased a .380 caliber semi-automatic pistol from Bright and Johnson's Sporting Goods Store in Elmwood Park, Illinois. Prior to the arrest of Milton Sims, Sims, Roosevelt Williams and Tim Eastern met socially. Sims asked Williams to bring his handgun. Williams placed the handgun into the trunk of Eastern's car, where it remained for approximately four months. The night before Sims was arrested, Sims and 'Tooter' visited Eastern and at that time, Eastern returned the gun to Sims. Sims then gave it to Rita Brown in a paper bag for safekeeping. DEA authorities obtained the gun when Brown was arrested. When authorities retrieved the gun, they discovered that although it was somewhat rusted, it was loaded with a round in the chamber and ready to fire. Both Williams and Milton Sims were convicted of using this firearm in relation to a drug trafficking offense. See 18 U.S.C. § 924(c)."

We now come to the issues raised by Mr. Sims, stopping first at his claim of ineffective assistance of his appellate counsel.

In *Page v. United States,* 884 F.2d 300, 302 (7th Cir.1989), the Court of Appeals for the Seventh Circuit recognized that claims of ineffective assistance of appellate counsel could be addressed in the district court through a habeas petition under 28 U.S.C. § 2255. The *Page* court set forth the relevant test when evaluating such a claim: "Counsel is ineffective only if performance below the norms of the profession causes prejudice.... Prejudice means a 'reasonable probability that, but for counsel's unprofessional errors, the result of the [appeal] would have been different....'" *Id.*

■ In his habeas petition, Sims argues that appellate counsel was ineffective in failing to address several errors at trial, chief among them the alleged ineffectiveness of his trial counsel, Mr. Barth. Sims then goes on

to detail the supposed errors of trial counsel in his second argument in the petition. Under *Page*, it is clear that this court has jurisdiction to review this first claim; however, the issue merges with the analysis of Mr. Sims' second claim involving attorney Barth. The practical effect of this is that Sims is not precluded from raising his habeas issues by the "cause and prejudice" standard of *Belford v. United States*, 975 F.2d 310, 313 (7th Cir.1992).

■ In reviewing the competency of Sims' appellate counsel, I agree with Mr. Sims' assessment at page 25 of his very well written brief that "Appellate Counsel turned out to be an even greater nightmare than his trial counsel." Attorney Devitt filed an appellate brief of less than 5 pages, raising three arguments, none of which had any merit or even relevance to the defendant's appeal. He then did not show up for oral argument, although he may have been proceeding under the assumption that he would be arguing the case over the phone. But concluding that Mr. Sims' appellate counsel was a "nightmare" does not mean that Sims suffered prejudice as a result of attorney Devitt's lackluster performance. Sims must show that the result of the appeal would have been different. For this analysis I must look to the appellate issues which Sims now raises. The two appellate issues form the remaining habeas issues raised by Sims. Those are: (1) attorney Barth was ineffective; and (2) I failed to make a finding that Corey Sims was a member of the conspiracy.

Corey Sims claims that attorney Barth was ineffective for the following reasons:

1. trial counsel did not move to suppress the results of the search of the defendant's residence on Budlong Ave.;

2. trial counsel did not move to suppress the stop of the defendant at the Memphis, Tennessee, airport;

3. trial counsel failed to request certain jury instructions; and

4. trial counsel failed to challenge the hearsay evidence.

Most every case raising an ineffective assistance of counsel claim starts with a review of *Strickland v. Washington*, 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A comprehensive analysis of the Supreme Court's decision in *Strickland* is found in *Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir.1987). There the Court of Appeals for the Seventh Circuit stated:

The burden on the petitioner is a heavy one. In order to establish that he was denied his sixth amendment right to counsel, he must affirmatively establish both components of the *Strickland* analysis—the performance component and the prejudice component. . . .

With respect to the performance component, the proper standard for attorney performance is that of reasonably effective assistance. The defendant must show that counsel's representation fell below an objective standard of reasonableness. In evaluating counsel's performance, all the circumstances must be considered. . . . In assessing counsel's performance our scrutiny must be highly deferential. We must make every effort . . . to eliminate the distorting effects of hindsight by indulging in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . .

With respect to the prejudice component it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Rather, the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Finally, throughout the analysis we must remember that the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. We must determine whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

As our cases in the wake of *Strickland* amply demonstrate, the foregoing principles erect a high hurdle for the petitioner.

Indeed we expect that few petitioners will be able to pass through the eye of the needle created by *Strickland.*

*Id.* at 1390–91 (citations and quotations omitted).

I turn now to the "deficiencies" Mr. Sims sees in Mr. Barth's performance as his trial counsel.

■ On April 26, 1988, law enforcement officers executed a state search warrant on the residence of Milton and Corey Sims located at 13002 Budlong in Gardena, California. Among other items, the police found a half-kilogram of cocaine in Corey's bedroom along with certain tools of the drug business, a beeper, and plastic baggies. Over $30,000 in cash was also discovered in various rooms of the house. Corey Sims now claims that attorney Barth was ineffective for failing to challenge the introduction of this evidence at his trial. Sims also claims that this search was ruled illegal by a judge, presumably a state judge in California. Sims provides no support for this claim, and in fact the claim is untrue. There was no such ruling in California or any other place regarding the legality of the search. As to the failure of trial counsel to try to suppress it, since the evidence was seized pursuant to a search warrant, in the absence of bad faith the evidence would have been admissible in Sims' trial regardless of any defect in the warrant itself. *See United States v. Leon,* 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984); *United States v. Dickerson,* 975 F.2d 1245, 1250 (7th Cir.1992). Since Sims has provided no evidence or arguments to show how the officers exercised bad faith in obtaining and executing the warrant, he has no cause to complain about trial counsel's failure to try to suppress the evidence seized in the Gardena house. Sims adds a second argument on the Budlong search. He says that his attorney failed to interview "the witnesses" to the search. This claim also lacks merit—the government followed its open-file discovery policy in this case, and all the reports and witness statements relating to the search were provided to the defense in advance of trial.

■ Sims also complains that his attorney was ineffective because he did not challenge "hearsay evidence" against him. Sims does not even try to identify this evidence or provide references to the trial transcript where this evidence can be found. Without such identification, it is impossible to respond to such a blanket claim. Sims' nonparticularized complaint about his attorney under this ground fails.

■ Sims also alleges that trial counsel failed to request several crucial jury instructions. First, trial counsel did not request an "addict" instruction as to the government witnesses. Sims does not name the witnesses who he thinks were addicts, nor does he detail the evidence which supports the conclusion that they were addicts. Sims also says his attorney should have requested a "Pinkerton" instruction because the evidence against him was circumstantial. This claim would have merit if attorney Barth had done the opposite, *i.e.,* had failed to oppose a "Pinkerton" instruction. A "Pinkerton instruction" is, in my experience, never requested by the defense because it allows the jury to find one coconspirator liable for the substantive conduct of another conspirator. It is a theory of liability that expands responsibility. There is no good reason for Sims to want a jury instructed consistent with Pinkerton. Furthermore, the case against Corey Sims was made by the direct testimony of his coconspirators. It was not only circumstantial evidence. Witnesses such as Adrienne Ross, Timothy Eastern, Rita Brown, and Ann Love provided direct evidence of Sims' role in this conspiracy. Finally, Sims claims that his attorney was ineffective for not requesting a multiple conspiracy jury instruction. Outside of making this claim about the jury instruction, Sims does not detail the evidence to support the argument that such an instruction was necessary, nor does he say that there were multiple conspiracies. He just says that the instruction was necessary. However, such a statement is not enough. Sims has the burden at this stage to show the merits of his complaints, and he has not even attempted to do so in connection with his arguments about the jury instructions.

■ Mr. Sims also complains that his attorney was ineffective because he failed to

challenge the July 31, 1988, police stop of Sims at the Memphis International Airport. The officers seized $15,665 from Corey in connection with that stop. The record is in fact silent as to a challenge of this stop. It appears that the evidence was never tested and was admitted at trial without objection. This being conceded, the airport stop remains the single omission of trial counsel which in any way might support Corey's argument that trial counsel was ineffective under *Strickland.* This is insufficient, because *Sullivan* says "the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Sullivan v. Fairman,* 819 F.2d 1382, 1390–91 (7th Cir.1987). Sims has not and cannot make such a showing. The evidence against Sims, as noted above, shows that Sims cannot meet the "prejudice" requirement of *Strickland.* In addition to the coconspirator testimony against him, Sims was the subject of search warrants, controlled drug buys in Los Angeles, surveillance, and police interdiction efforts. Numerous pieces of circumstantial evidence, not the least being a mountain of phone charts, also tied him to the conspiracy and to his coconspirators. Regardless of the real or imagined errors of Mr. Barth and how those errors might play out under the "performance" component of *Strickland,* nothing Sims has alleged in his petition is sufficient "to undermine confidence in the outcome." Sims has failed to meet his burden.

Sims finally argues that I never made a finding on the record that he was a member of the charged conspiracy, and thus the introduction of coconspirator statements under rule 801(d)(2)(E) was improper. This identical issue was raised by Sims' codefendant, Saul Ochoa, in his direct appeal. The Seventh Circuit rejected that argument and, as the law of the case, that decision is binding on Corey Sims in the instant petition.

For these reasons, the petition of Corey Sims is DENIED.

SO ORDERED.